**STATE of Tennessee, Appellee,**

v.

**Lisa Christine OWENS, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Sept. 11, 1991.

No Permission to Appeal Applied for to the Supreme Court.

758

Greg W. Eichelman, Public Defender, and R.B. Baird, III, Asst. Public Defender, Morristown, for appellant.

Charles W. Burson, Atty. Gen., and Jeannie Kaess, Asst. Atty. Gen., Nashville, C. Berkeley Bell, Dist. Atty. Gen., Greeneville, Doug Godbee, Asst. Dist. Atty. Gen., Rogersville, for appellee.

## OPINION

BYERS, Presiding Judge.

The appellant was convicted by a jury of criminally negligent homicide. She was sentenced as a Range I standard offender to the maximum sentence of two years.

On appeal, she raises two issues:[1]

1. Was the evidence in this case sufficient to sustain a verdict of guilty?

2. Was the sentence excessive?

The judgment is reversed and the case dismissed.

This case involves the death of the appellant's seriously handicapped eleven-month-old daughter, Leanne.

Leanne was born with a dysfunctional diaphragm and, for a period of time after her birth, required constant monitoring and the use of a ventilator to help her breathe. Several drugs commonly used in asthma cases were prescribed to ease the child's breathing problems. She had a gastrostomy tube surgically implanted in her side, through which she was fed, and a permanent tracheostomy. Frequent manual suctioning of the trachea was required to remove secretions from the child's lungs which, because of her condition, she was unable to remove on her own. Leanne was also at least partially deaf.

Following the child's birth on March 22, 1989, she remained hospitalized until June 29, 1989. Upon her discharge, Leanne and the appellant lived with the appellant's father and step-mother. A ventilator was required in the home as well as an apnea or heart monitor which sounded an alarm if the child ceased breathing or the heart rate moved above or below certain preset limits. The appellant was trained in the use of the various support systems, monitoring devices, and suctioning and resuscitation techniques prior to Leanne's discharge from the hospital.

Dr. Sharon Lail, a neo-natologist, was the child's primary physician. Dr. Lail testified about the child's medical condition and history of treatment. She testified she warned the appellant that taking Leanne out in public exposed her to a great risk of infection and that "if this child were to die, the most likely cause of death, aside from an accident like the tracheostomy becoming dislodged, would be that she would develop a respiratory infection ..." She also instructed the appellant to keep Leanne on the apnea monitor whenever she was not being directly observed.

On January 5, 1990, the appellant and Leanne moved to their own apartment. Up to this point, the child had been re-hospitalized twice. The appellant had begun to take the child out with her on a regular basis. When she became aware of this, Dr.

---

**1.** Two other issues were initially raised in this appeal, but the appellant has chosen not to pursue them further.

Lail had a portable respirator developed that could be used outside the home.

On January 25, Leanne was treated by a pediatrician, Dr. Morin, for an ear infection. Dr. Morin was preparing to take over Leanne's case because Dr. Lail's specialty was the treatment of children between birth and age one, only. The appellant returned Leanne to the emergency room that evening because she was having difficulty breathing. She was treated and released. The appellant took Leanne back to the hospital the next day because she was in acute distress. This time Leanne was admitted to the hospital and remained there until February 12th. She was diagnosed as having a lower respiratory tract infection.

After the child's release, Dr. Morin ordered a pulse oximeter monitor delivered to the appellant. This device measured the amount of oxygen Leanne's body was absorbing. An alarm sounded if the level of oxygen in the blood fell below the required saturation levels.

Dr. Morin testified the pulse oximeter did not have to be used continuously, but instructed the appellant, again, to keep the apnea monitor on at all times when Leanne was not being directly observed. By this time, Leanne did not need to be on the ventilator constantly, although it remained in the apartment in case her condition deteriorated.

On March 16, 1990, the appellant took Leanne to Dr. Morin's office for what appears, from the record, to have been a regular office visit. Early Saturday morning, March 17, the appellant took Leanne to the emergency room because she could not breathe. Dr. Morin treated her and released her to go home. He testified he did not have a prescription pad, but directed the appellant to have a pharmacist contact him later in the day and he would prescribe an antibiotic. He testified he was never contacted. The appellant testified she was told only to resume the medications Leanne used in January.

The appellant testified the child slept most of the rest of that day and had an uneventful night. She took the child to work with her the next day, Sunday, and stated the child did fine and had good color. She testified she put Leanne to bed around 8:00 p.m. Sunday night after feeding her and giving her "a treatment"—presumably her medication. She said she fed Leanne again between 11:00 p.m. and midnight before going to bed herself.

According to her testimony, the appellant next checked Leanne around 4:00 a.m. The pulse oximeter was connected and her oxygen saturations were good. She had good color and was not wheezing. The appellant removed the child from all monitors at that time and took Leanne back to bed with her. When she awoke at 6:23 a.m., Leanne was not breathing and could not be resuscitated.

According to the pathologist who did the autopsy, the cause of death was a severe lung infection, including both bronchitis and pneumonia, in which the bacteria causing the infection emitted toxins which poisoned the child. A large amount of secretions were found in the lungs and air tubes. There were no perceptible levels of any of the prescribed medications in the blood stream. A small amount of one of the medications was found in the stomach, indicating it had been administered shortly before, or possibly after, death.

The state presented several other witnesses who related incidents in which the care the appellant gave to Leanne did not conform to the instructions given by the doctors. The appellant offered witnesses who attested to the good care she gave the child and the love she exhibited for her.

The appellant was charged under T.C.A. § 39-13-208:

> **39-13-208. Criminally negligent homicide [Effective November 1, 1989].**—(a) Criminally negligent conduct which results in death constitutes criminally negligent homicide.

The Sentencing Commission Comments to this statute make clear "that simple negligence, as defined in civil law, is insufficient for criminal liability." *See also, Copeland v. State,* 154 Tenn. 7, 285 S.W. 565 (1926).

The requisite *mens rea* for this crime is defined in T.C.A. § 39-11-302:

**39–11–302. Definitions of culpable mental state**

. . . . .

(d) "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

These statutes were enacted into law as part of the 1989 Criminal Reform Act and became effective on November 1, 1989. The Sentencing Commission Comments note that the criminally negligent homicide statute replaces the crime of involuntary manslaughter in Tennessee. The two crimes are sometimes distinguished, however, by the culpable mental state required:

Although there is a difference between involuntary manslaughter and criminally negligent homicide, they are closely related offenses. The difference between the two offenses is the culpable mental state required to prove each offense: criminal negligence for criminally negligent homicide, and recklessness for involuntary manslaughter. Under statutory provisions, the difference between manslaughter based on reckless conduct and criminally negligent homicide is the difference between recklessness and criminal negligence, and the failure to perceive the risk from one's conduct is the element that distinguishes criminally negligent homicide from involuntary manslaughter. (footnotes omitted)

40 C.J.S. Homicide § 69 (1991).

The elements of criminally negligent homicide, then, are the accused's guilt of criminal negligence, as defined in T.C.A. § 39–11–302, and a finding that the criminally negligent act, or omission, was the proximate cause of death. In this case, the proof fails on both counts.

The duty of care imposed upon the parent of a child as severely impaired as Leanne, is perhaps greater than that for the parent of a less handicapped child. But the risks inherent in the care of such a child are particularly high, as well. On cross-examination, Dr. Lail offered some insight and perspective into the appellant's situation.

Dr. Lail: ... I'm not saying that Lisa Owens was not a good mother. Lisa Owens had a very very formidable task. Lisa Owens had someone she had to watch by herself without any help twenty-four (24) hours a day. Seven (7) days a week. Fifty-two (52) weeks a year.

Attorney: Isn't it true the person she was watching could be a relatively happy baby one moment and very ill the very next?

Dr. Lail: That's right, and it's also true that there were no guarantees. I couldn't tell Lisa that if you devote all of this time to this baby that she's going to grow up and go to college. I couldn't tell her that.

Attorney: Just as you can not tell the jury that if a monitor was hooked up that night that that baby still wouldn't be dead? You don't know, do you?

Dr. Lail: The baby could have died from a respiratory infection despite what we can do. It depends upon what the infection is.

Although some carelessness and negligence on the part of the appellant is shown in this record, we cannot say it rose to the level of gross negligence required to sustain a conviction under this statute. It is not sufficient to say, with 20/20 hindsight, that the appellant could have, or should have, done some things differently. To affirm this conviction we must view the circumstances under which the appellant acted and find she failed to perceive that her conduct presented an unjustifiable risk to her child. The failure to perceive the risk must be a *gross* deviation from the

standard of care that an *ordinary* person would exercise *under the circumstances.*

Throughout this record, it is clear the appellant was given wide latitude to exercise her own judgment regarding the proper care of her child. She was warned of the dangers of infection if she took Leanne out in public, but was accommodated by the development of a portable ventilator. She was told there were greater risks when Leanne had an infection, yet the child was repeatedly released into the appellant's care when infection was present. Generally, the record supports a finding that Leanne was adequately cared for by the appellant. She provided regular medical care for her child and took her to the doctor or the hospital in times of emergency. In view of this, we cannot say the appellant failed to perceive the risks involved or, if she did, that the failure was such a gross deviation from the required standard of care that her conviction should stand.

Nor can we say the appellant's carelessness or negligence was the proximate cause of her child's death. The autopsy determined the cause of death was a severe lung infection. Clearly the risk of infection was greater when the appellant took the child into public places, as she admits doing. Yet there is no evidence of how the infection which caused Leanne's death was contracted. Dr. Lail testified that "not all infections are preventable" and some infections would have cause death "despite what we can do." Such findings do not show, beyond a reasonable doubt, that the appellant's actions caused the death of this child.

BIRCH, J., and WILLIAM P. NEWKIRK, Special Judge, concur.