**STATE of Tennessee, Appellant,**

v.

**Nora ADAMS, Appellee.**

Court of Criminal Appeals of Tennessee, at Nashville.

Oct. 26, 1995.

Charles W. Burson, Attorney General & Reporter, Nashville, Kathy M. Principe, Assistant Attorney General, Nashville, Dan M. Alsobrooks, District Attorney General, Charlotte, James W. Kirby, Asst. District Attorney General, Ashland City, for Appellant.

Sam Wallace, Sr., Nashville, for Appellee.

1. The state also contends that the decision of the trial court to suspend Adams's sentence and place her on probation should be reversed. This

## OPINION

JONES, Judge.

The State of Tennessee appeals as of right from a judgment of the trial court setting aside a conviction for criminally negligent homicide and granting Nora Adams's post-trial motion for judgment of acquittal. The state contends that the trial court "erroneously concluded that the evidence did not support the offense of criminally negligent homicide." [1]

The judgment of the trial court is reversed. This case is remanded to the trial court for such further action as the trial court may deem appropriate.

### I.

The Attorney General questions whether an appeal as of right is the appropriate appellate remedy in this case. He states in his brief:

> The State below filed a notice of appeal pursuant to T.R.A.P. 3. However, it may be that the Court will find that an interlocutory appeal would have been the appropriate method of appeal. If so, the State respectfully requests that this Court treat the appeal as one brought pursuant to T.R.A.P 10.

The right of the State of Tennessee to appeal a final judgment is governed by Rule 3(c), Tenn.R.App.P. This rule provides:

> In criminal actions an appeal as of right by the state lies only from an order or judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Criminal Appeals: (1) the substantive effect of which results in the dismissing an indictment, information, or complaint; (2) *setting aside a verdict of guilty and entering a judgment of acquittal;* (3) arresting judgment; (4) granting or refusing to revoke probation; or (5) remanding a child to the juvenile court. The state may also appeal as of right from a final judgment in a habeas corpus, extradition, or post-conviction proceeding. [Emphasis added].

issue was rendered moot by the trial court granting the post-trial motion for judgment of acquittal.

Of course, the State of Tennessee can appeal as of right certain sentencing issues. Tenn. Code Ann. § 40–35–402 (1990). The rule regulating judgments of acquittal specifically grants the State of Tennessee an appeal as of right when the trial court sets aside a verdict of guilt and enters a judgment of acquittal. Tenn.R.Crim.P. 29(c).

In *State v. McMahan,* 614 S.W.2d 83 (Tenn.Crim.App.), *per. app. denied* (Tenn. 1981), the accused was convicted of six counts of passing a forged instrument by a jury of his peers. The trial court granted the accused's post-trial motion for judgment of acquittal as to two counts. The State of Tennessee appealed as of right pursuant to Tenn.R.App.P. 3(c)(2) and Tenn.R.Crim.P. 29(c). This Court reversed the judgment of the trial court and remanded the case for the entry of a judgment of conviction in both counts.

In *State v. Smith,* 695 S.W.2d 527 (Tenn. 1985), the accused was convicted of involuntary manslaughter by a jury of his peers. The trial court granted the accused's post-trial motion for judgment n.o.v. and dismissed the prosecution with prejudice. The State of Tennessee appealed as of right. This Court reversed the judgment of the trial court and remanded for a new trial on procedural grounds. The Supreme Court held that a motion for judgment n.o.v. was "unknown to the rules and practice" in criminal cases. The Court said that the action of the trial court was the equivalent of entering a motion for judgment of acquittal pursuant to Rule 29(c), Tenn.R.Crim.P. The Supreme Court also reversed the judgment of the trial court, but it did so for a different reason. The Supreme Court's remand was "with direction to enter a judgment of conviction upon the jury verdict finding [the] defendant guilty of involuntary manslaughter." 695 S.W.2d at 530.

In summary, the appropriate appellate remedy in this case is an appeal as of right pursuant to Rule 3(c), Tenn.R.App.P. Consequently, the District Attorney General selected the right remedy to obtain appellate review of the trial court's judgment setting aside the jury's verdict and entering a post-trial judgment of acquittal.

The next question that must be addressed is the standard of appellate review.

## II.

 A motion for judgment of acquittal raises a question of law for the determination of the trial court. *State v. Hall,* 656 S.W.2d 60, 61 (Tenn.Crim.App.), *per. app. denied* (Tenn.1983). In resolving this question, the trial court's only concern is the legal sufficiency of the evidence. *Hall,* 656 S.W.2d at 61. The trial court is not permitted to weigh the evidence in reaching its determination.

 In determining whether the evidence is sufficient to sustain a conviction post-trial, the trial court must consider the evidence in the light most favorable to the State of Tennessee. *State v. Thompson,* 549 S.W.2d 943, 946 (Tenn.1977); *Hall,* 656 S.W.2d at 61; *State v. Stowe,* 634 S.W.2d 674, 675 (Tenn.Crim.App.1982). In addition, the trial court must afford the State of Tennessee all reasonable and legitimate inferences that may be drawn from the evidence adduced in favor of the state's theory. *Thompson,* 549 S.W.2d at 946; *Hall,* 656 S.W.2d at 61; *Stowe,* 634 S.W.2d at 675. The trial court must also disregard any countervailing evidence that the accused may have introduced during the trial. As this Court said in *State v. Hall:* "[I]f ... there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the evidence of the State, the trial judge should ... overrule the motion...." 656 S.W.2d at 61.

 An appellate court must apply the same standard as a trial court when resolving issues predicated upon the grant or denial of a motion for judgment of acquittal.

## III.

### A.

Historically, involuntary manslaughter was proscribed by the laws of this State. In 1989, the offense of criminally negligent homicide was created by the General Assembly to replace involuntary manslaughter. Sentencing Commission Comments to Tenn.

**474**

Code Ann. § 39–13–212; *State v. Owens*, 820 S.W.2d 757, 760 (Tenn.Crim.App.1991).

■ While the elements of involuntary manslaughter and criminally negligent homicide are closely related, the culpable mental state that is required to sustain a conviction for each offense is different. *Owens*, 820 S.W.2d at 760. In 40 C.J.S., *Homicide* § 69 (1991), which is cited with approval in *Owens*, it is said:

> Although there is a difference between involuntary manslaughter and criminally negligent homicide, they are closely related offenses. The difference between the two offenses is the culpable mental state required to prove each offense: criminal negligence for criminally negligent homicide, and recklessness for involuntary manslaughter. Under statutory provisions, the difference between manslaughter based on reckless conduct and criminally negligent homicide is the difference between recklessness and criminal negligence, and the failure to perceive the risk from one's conduct is the element that distinguishes criminally negligent homicide from involuntary manslaughter. [footnotes omitted].

This Court must now examine the elements of the offense of criminally negligent homicide.

**B.**

■ Before an accused can be convicted of criminally negligent homicide, the State of Tennessee must prove beyond a reasonable doubt that (a) a person died and (b) the death of the person was the direct and proximate result of the accused's criminal negligence. Tenn.Code Ann. § 39–13–212(a). *Owens*, 820 S.W.2d at 760; *see State v. Slater*, 841 S.W.2d 841 (Tenn.Crim.App.1992). As a general rule, the pivotal question is whether the accused's conduct constituted "criminal negligence."

In this jurisdiction, criminal negligence equates to "a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn.Code Ann. §§ 39–11–106(a)(4) and –302(d). An accused who engages in conduct under circumstances that he or she knows, or should know, will create "a substantial and unjustifiable risk," as defined by the statute proscribing this offense, commits an act with criminal negligence. Tenn.Code Ann. §§ 39–11–106(a)(4) and –302(d); *see State v. Butler*, 880 S.W.2d 395, 397 (Tenn. Crim.App.1994). In other words, the accused must know, or should know, that his or her conduct, or the result of that conduct, will imperil the life of another given the circumstances that exist when the conduct takes place. *See State v. Clifton*, 880 S.W.2d 737, 742 (Tenn.Crim.App.), *per. app. denied* (Tenn.1994).

This Court must now examine the record to determine if the evidence, considered in the light most favorable to the State, was sufficient to support a finding by a rational trier of fact of criminally negligent homicide beyond a reasonable doubt.

**IV.**

The Cheatham County Grand Jury returned a presentment charging Adams with the offense of second degree murder. The victim was Brandy Ann Conquest, Adams's niece. The trial court charged the jury on the elements of murder in the second degree as well as the lesser included offenses of voluntary manslaughter and criminally negligent homicide. The jury returned a verdict finding Adams guilty of criminally negligent homicide.

The trial court concluded post-trial that the evidence adduced during the trial was insufficient, as a matter of law, to support a finding by a rational trier of fact that Adams was guilty of criminally negligent homicide beyond a reasonable doubt.[2] Thus, the trial court set aside the conviction and entered a judgment of acquittal.

The state's theory was that Adams inflicted the fatal injuries to the victim while attempting to discipline her. Adams at-

2. The trial court made it clear that he was not exercising his prerogative as the thirteenth juror. *See* Tenn.R.Crim.P. 33(f). The court said:

"[T]his is not the 13th juror ruling. This is an insufficiency of [the] evidence ruling." *See* Tenn. R.Crim.P. 29(c).

tempted to establish that the injuries were accidental. Her theory was that the victim was jumping on her bed, fell, and sustained the fatal injuries when her head struck a piece of furniture.

### A.

The victim, Brandy Ann Conquest, was the daughter of Brenda Conquest, the appellee's sister. Brenda Conquest died of spinal meningitis when Brandy was approximately fifteen months old. Brenda Conquest made it known to family members that she wanted Adams to raise Brandy if she died while Brandy was a child. Adams obtained custody of Brandy after a brief dispute with another relative. Brandy was almost three years of age when she died.

On June 3, 1991, Brandy sustained injuries while in her bedroom. The appellee attempted to revive the child by wiping her face with a cold cloth, placing the child's head in front of an air conditioner, placing the child in front of a fan, and attempting CPR albeit the appellee was not trained in this technique. The appellee subsequently called 911 and an ambulance was dispatched to the Adams residence.

Brandy was taken to the Ashland City Medical Center. Shortly after her arrival, the medical personnel made the decision to transfer Brandy to Vanderbilt University Hospital. She was taken to Nashville by helicopter. Brandy died on June 4, 1991 at 10:36 a.m. Later that day, the assistant medical examiner of Davidson County performed an autopsy on Brandy's body.

The ensuing autopsy established that the cause of Brandy's death was "multiple blunt trauma to the head." Fresh contusions found upon the victim's left cheek, right forehead, the left side of her head, and the top of her head were of particular importance to the medical examiner. The autopsy revealed that the two traumatic blows to the victim's head had resulted in a subdural hemorrhage, a subarachnoid hemorrhage, multiple cerebral cortical contusions, and remarkable edema or swelling that resulted in a herniation of the brain. These injuries caused drastic changes in the remainder of the victim's body, including the respiratory system and the heart.

The injuries sustained by the victim and the cause of death are not disputed. It is also undisputed that Adams was the only person who interacted with the victim on the morning in question. Mr. Adams had left the residence. Adams's children were playing in the backyard. Mr. Adams's father, who lived with the family, was in the living room. However, the cause of the injuries was disputed.

Adams testified that she had asked Brandy to get dressed on four or five occasions. Brandy did not comply with these requests. Adams obtained a switch, went into Brandy's bedroom, and began spanking her. Brandy sat on the floor and "scooted" around the room with her posterior to the floor. Obviously, Brandy was attempting to evade the spanking. According to Adams, Brandy "bumped" the chest of drawers while "scooting" around the room. However, Adams admitted that Brandy did not hit the chest with great impact, and the encounter did not break the child's skin or leave a mark.

Later, the appellee heard Brandy jumping on her bed. Then she heard Brandy fall to the floor. When Adams went to the bedroom, she found Brandy on the floor. In Adams's words, the fall seemed to have "knocked the breath out of her for a few minutes." Adams assured Brandy that she would be fine, and she told Brandy to put on her shoes and socks.

Adams went to the living room to watch television. The noise from a television and an air conditioner made it difficult for her to hear what was transpiring in the remainder of the residence. However, she subsequently heard Brandy "holler" and she went to investigate. She again found Brandy on the floor. This time Brandy was having trouble breathing—she was "gasping for air." When efforts to revive Brandy failed, Adams called 911.

### B.

The medical examiner opined that the severe brain injuries could have been caused by Brandy "moving and hit[ting] something as

she would have if she were falling or if she were thrown or if she were propelled by something across a space and hit something." The "bumping" of the chest of drawers could not have caused these injuries. Also, the medical examiner eliminated the possibility that the injuries were caused by a fall from a bed. The medical examiner explained:

> I asked about the height of the bed. If it had been a very, very tall bed and she'd been jumping up and then down, or if she had been able to climb up on something fairly tall, then I might have been able to explain that on the basis of a fall from a height. But the fact of there being two and not knowing where those two [bruises and injuries to the brain] could have been caused in the bedroom by one fall did not work well, and the bed, itself, I am told, was not particularly tall. So we're dealing with more acceleration or more speed to the injury than is typical for a child jumping around on a bed and falling off.

When asked what did cause these injuries, the medical examiner stated:

> The combination of what looked to be the little linear marks that suggests the possibility of switching in a child that may have been squirming and carrying on, suggest the possibility of a slinging type motion with the head striking something.
>
> There is a possibility that these could have been caused, at least one of them, by anything, including a hand. If enough force is supplied, then that will cause bruising to the brain. Other than that, a combination of something impacting the head twice or the head impacting on something twice, as suggested by the bruising, is what is suggested in this case.

The medical examiner also testified that the traumatic injuries were caused by at least two blows to or impacts of the head. The severity of the impacts is illustrated by the following description:

> This was not a routine, uncomplicated subdural hemorrhage that you would expect to see from a blow to the head, but, instead, has an element of brain acceleration and deceleration to it, as in the shaken-baby syndrome or as in malignant cerebral ede-

ma that a skier would suffer on impact with a tree at a remarkable velocity.

The medical examiner concluded that "an accelerating/decelerating injury [had] to have occurred here"—"a moving head striking a fixed object or objects."

## V.

It is a well-established rule of law that a criminal offense may be established exclusively by circumstantial evidence. *Marable v. State*, 203 Tenn. 440, 451–54, 313 S.W.2d 451, 456–57 (1958); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn.Crim.App.), *per. app. denied* (Tenn.1990); *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn.Crim.App. 1987); *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn.Crim.App.1987); *State v. Hailey*, 658 S.W.2d 547, 552 (Tenn.Crim.App.), *per. app. denied* (Tenn.1983). However, before an accused can be convicted of a criminal offense based exclusively upon circumstantial evidence, the evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Crawford*, 225 Tenn. at 484, 470 S.W.2d at 613; *Cooper*, 736 S.W.2d at 129. In this case, the facts and circumstances contained in the record are "so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant." *Crawford*, 225 Tenn. at 484, 470 S.W.2d at 613.

It is obvious that the jury did not believe the appellee's version of what occurred. She gave two statements shortly after Brandy was injured. There were variations in her testimony and in the statements albeit there were more consistencies than inconsistencies. It is understandable why there were inconsistencies. The first statement was made shortly after Brandy died. The second statement was made on the evening of Brandy's funeral. Also, there were several people asking questions, deputy sher-

iffs and representatives of the Department of Human Services.

The record is clear that Brandy Ann Conquest was incapable of inflicting the severe brain injuries that she suffered in this case, and a fall from a bed would not cause the injuries she sustained. The only person capable of inflicting the acceleration/deceleration type injuries Brandy sustained was the appellee—the only person who interacted with Brandy on the morning of June 3, 1991.

This Court concludes that the evidence contained in the record, considered in its most favorable light to the state, is sufficient to support a finding by a reasonable trier of fact that the appellee was guilty of criminally negligent homicide beyond a reasonable doubt.

### VI.

When the trial court granted the motion for judgment of acquittal, it rendered the issues contained in the appellee's motion for new trial moot. The record reflects that the trial court did not rule upon the merits of these issues. Thus, it would be unfair to the appellee to finalize this lawsuit without giving the appellee and the state the opportunity to argue the merits of the issues raised in the motion for a new trial, and having the trial court resolve these issues. In addition, the trial court has the duty to consider the evidence as the thirteenth juror. Tenn. R.Crim.P. 33(f); *State v. Carter*, 896 S.W.2d 119, 122 (Tenn.1995); *see State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993).

The trial court may want to conduct a new sentencing hearing to determine whether the appellee's sentence should be suspended and she be placed on probation. Contrary to the contention of the state, this Court has held that the rationale of *Kilgore v. State*, 588 S.W.2d 567, 568 (Tenn.Crim.App.), *per. app. denied* (Tenn.1979), no longer applies. *See State v. Hartley*, 818 S.W.2d 370, 374–75 (Tenn.Crim.App.), *per. app. denied* (Tenn. 1991).

The offense of criminally negligent homicide is a Class E felony, and the appellee was sentenced as a standard offender. Thus, it is presumed that she is a favorable candidate for alternative sentencing. Tenn. Code Ann. § 40–35–102(6). If the rationale of *Kilgore* was applied in this case, it would have the effect of destroying the clear legislative intent of this statute. *See State v. McKinzie Monroe Black*, Robertson County No. 01–C–01–9401–CC–00006, 1995 WL 415233 (Tenn.Crim.App., Nashville, July 14, 1995).

In view of the foregoing, the judgment of the trial court granting the post-trial judgment of acquittal is reversed. This case is remanded to the trial court for consideration of the issues raised in the appellee's motion for a new trial as well as whether the appellee's sentence should be suspended and the appellee placed on probation on such terms and conditions as the trial court may see fit.

WADE, J., and ALLEN R. CORNELIUS, Jr., Special Judge, concur.