# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**October 16, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

STATE OF TENNESSEE,　　　　　)
DEPARTMENT OF CHILDREN'S　)
SERVICES,　　　　　　　　　　)
　　　　　　　　　　　　　　　)　Cheatham Juvenile
　　　Plaintiff/Appellee,　　　)　No. 91-516
　　　　　　　　　　　　　　　)
VS.　　　　　　　　　　　　　)　Appeal No.
　　　　　　　　　　　　　　　)　01A01-9709-JV-00476
N.A.A. and J.M.A.,　　　　　　)
　　　　　　　　　　　　　　　)
　　　Defendants/Appellants.　)

APPEAL FROM THE JUVENILE COURT
FOR CHEATHAM COUNTY
AT ASHLAND CITY, TENNESSEE

THE HONORABLE PHILLIP A. MAXEY, JUDGE

For Plaintiff/Appellee:　　　　　　　For Defendants/Appellants:

John Knox Walkup　　　　　　　　　Sam Wallace, Sr.
Attorney General and Reporter　　　　Nashville, Tennessee

Douglas Earl Dimond
Assistant Attorney General

## AFFIRMED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves the termination of the parental rights of the parents of four children between seven and thirteen years of age. The children were removed from their parents' custody in 1991 after their mother was accused of physically abusing their infant cousin who later died of her injuries. In April 1997 the Tennessee Department of Children's Services petitioned the Cheatham County Juvenile Court seeking to terminate the mother's and father's parental rights. The juvenile court conducted a bench trial and terminated the parents' parental rights. On this appeal, the parents assert that the decision is not supported by clear and convincing evidence. We affirm the judgment terminating the parents' parental rights because the Department has presented clear and convincing evidence establishing the statutory grounds for terminating parental rights and demonstrating that the children's best interests will be best served if they can be integrated into a stable and permanent home as soon as possible.

## **I.**

N.A.A. and J.M.A. both grew up in the Davidson County area and were married in the mid-1980s. N.A.A. has an eleventh grade education; while J.M.A. quit school after completing the eighth grade. They had their first child, J.L.A., in 1984. Their second son, B.M.A., was born in 1987, and their third son, J.D.A., in 1989. Throughout most of their marriage N.A.A. did not work outside the home but rather spent her days cooking, cleaning, sewing, and performing other household duties. J.M.A. held several jobs during their marriage but at all times relevant to this case was unemployed due to a back injury. The family's primary source of income was derived from government benefits.

In 1990 N.A.A.'s sister, who was suffering from terminal spinal meningitis, asked the couple to take her daughter into their home. N.A.A. and J.M.A. agreed to raise their niece, B.C., who was less than two years old at the time. B.C.'s mother died soon thereafter, and N.A.A. and J.M.A. were awarded custody of the child. On June 4, 1991, B.C. died from severe head injuries. An autopsy revealed that the cause of the child's death was "multiple blunt trauma to the head," and the coroner equated the child's injuries to "shaken baby syndrome" or to injuries caused by the impact when a skier hits a tree at a remarkable velocity.

N.A.A. insisted that B.C. sustained her injuries by hitting her head on a dresser while jumping on her bed. Nonetheless, the authorities charged N.A.A. with B.C.'s death. On June 11, 1991, representatives of the Department of Human Services removed N.A.A.'s and J.M.A.'s three sons from their home. Family members initially agreed to care for the children, but the children were eventually placed in foster homes. In August 1991, while she was incarcerated awaiting trial for the death of B.C., N.A.A. gave birth to the couple's fourth child, A.M.A.A.. The baby was immediately placed in a relative's home and later in foster care. On February 25, 1992, N.A.A. was convicted of criminally negligent homicide in connection with the death of B.C.. Although the trial court set aside the conviction, it was later reinstated on appeal.[1] N.A.A. eventually received a one-year suspended sentence and was placed on probation for one year.

N.A.A.'s and J.M.A.'s children have lived in foster homes or public facilities continually since June 1991. They have seen their parents only during periodic visitation that has been supervised by the Department of Children's Services. When the three oldest children were first placed in foster care, they were developmentally delayed and exhibited severe emotional and behavioral problems, including aggression toward others and inappropriate sexual conduct. The two oldest boys also alleged that they had been sexually abused. The youngest child, who has never lived with her biological parents, is the only child who appears to be happy and well-adjusted.

During the next six years, the Department offered both N.A.A. and J.M.A. opportunities to participate in programs that would enable them to regain custody of their children. These opportunities included individual and family counseling, parenting classes that focused on effective and appropriate methods of disciplining their children, and other sessions designed to heighten their awareness of their children's special needs. The Department also encouraged N.A.A. and J.M.A. to confront difficult issues such as the sexual abuse allegations made by their two oldest sons. Despite their attendance at these sessions, the Department eventually concluded that N.A.A. and J.M.A. had failed to improve their parenting skills or to remedy the conditions that led to their children's removal in the first place. They declined to accept that J.L.A. is mentally retarded or that any of their children possess special

---

[1]*See State v. Adams*, 916 S.W.2d 471 (Tenn. Crim. App. 1995).

needs. They also consistently denied that their two oldest sons had been sexually abused and refused to even discuss their sons' allegations during counseling sessions.

On May 1, 1997, the Department filed a petition in the Cheatham County Juvenile Court to terminate N.A.A.'s and J.M.A.'s parental rights because of severe child abuse and persistence of the conditions that caused the initial removal. N.A.A. and J.M.A. responded to the petition by denying that they ever abused, neglected, or abandoned their children. On July 30, 1997, almost six years after the children had been removed from their parents' custody, the children's guardian ad litem filed a report with the Juvenile Court concluding that the children were improving in foster care and that N.A.A. and J.M.A. had not yet acquired the necessary parenting skills and knowledge to care for their children. Accordingly, the guardian recommended that the children's interests would be best served by terminating N.A.A.'s and J.M.A.'s parental rights and by allowing J.L.A. to remain in therapeutic foster care and by allowing the remaining children to be adopted by their respective foster families.

Following a bench trial, the juvenile court terminated N.A.A.'s and J.M.A.'s parental rights on four grounds: (1) N.A.A.'s conviction for criminally negligent homicide, (2) the unsuccessful effort to reunite the family, (3) the psychological tests indicating that both N.A.A. and J.M.A. exhibited traits of potential child abusers, and (4) N.A.A.'s and J.M.A.'s refusal to deal with the sexual abuse allegations of their two oldest sons. The juvenile judge also concluded that all four children, after six years of instability, deserved an opportunity to be placed in a permanent home and that the foster families of the three youngest children desired to adopt them.

## II.

Because the decision to terminate parental rights involves fundamental constitutional rights, *see O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995), the courts must find that the Department has established by "clear and convincing evidence" the statutory grounds required to terminate the parents' parental rights. *See* Tenn. Code Ann. §36-1-113 (c)(1) (Supp. 1998); *State Dept. of Human Services v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). This heightened standard of review serves to prevent the unwarranted termination or interference with the biological parents' rights to their children.

Parental rights can be terminated in only a limited number of statutorily defined circumstances and then, only if a court determines that termination is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113 (c)(2) (Supp. 1998). Parental rights may be terminated only when continuing the parent-child relationship poses a substantial threat of harm to the child. *See Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995). As pertinent in this case, Tenn. Code Ann. §36-1-113 (g)(3)(A) allows the termination of parental rights if (1) the child has been removed from the home of the parent by court order for six months and (2) the conditions which led to the removal or other similar conditions still persist, are unlikely to be remedied in the near future, and the continuation of the parent-child relationship greatly diminishes the child's chances of early integration into a stable and permanent home. In addition, Tenn. Code Ann. § 36-1-113 (g)(4) permits termination of parental rights if the parent has committed severe child abuse.

The juvenile court found that the Department established by clear and convincing evidence two grounds for terminating N.A.A.'s and J.M.A.'s parental rights - persistence of conditions and severe abuse of B.C. We agree. The evidence presented to the juvenile court shows that B.C. was abused and that removal of N.A.A.'s and J.M.A.'s four children from the home was proper.

## A.
### EVIDENCE OF SEVERE CHILD ABUSE

N.A.A. stands convicted of the criminally negligent homicide of her fifteen-month-old niece who was living with N.A.A. and J.M.A at the time of her death. Despite her continuing protestations that she is not responsible for B.C.'s death, N.A.A.'s culpability has been fully and finally adjudicated by the Court of Criminal Appeals. This proceeding does not provide an occasion to collaterally attack that conviction. N.A.A.'s conduct clearly amounts to severe child abuse under Tenn. Code Ann. § 36-1-113 (g)(4), and thus the Department has proved by clear and convincing evidence that N.A.A. has engaged in conduct warranting termination of her parental rights under Tenn. Code Ann. § 36-1-113 (g)(4).

## B.
### PERSISTENT CONDITIONS

The Department has also presented clear and convincing evidence that N.A.A. and J.M.A. have been unable to acquire the parenting skills and knowledge necessary to care for their children. Despite the Department's efforts, the parents continue to refuse to believe that J.L.A. is mentally retarded or that any of their children possess special needs. They have not learned to discipline the children effectively. N.A.A. continues to deny any involvement with her niece's death and refuses to deal with the issue in counseling. J.M.A. admits that he feels distant from his children and does not interact with them during visitation.

The two psychological evaluations administered to N.A.A. and J.M.A. in 1992 and 1995 demonstrate that they have not made progress in improving their parenting abilities under the Department's plan of care. The initial evaluation classified both parents as risks for dysfunctional parenting and as poor candidates for therapy. It indicated that N.A.A. possessed characteristics signifying tendencies toward child abuse and that J.M.A. was defensive and mildly paranoid and that he harbored intense anger. The second evaluation revealed that N.A.A. and J.M.A. continued to demonstrate risk factors for abuse and had not benefitted from the parenting skills they had been taught.

The most serious failure to address and remediate problems similar to those that led to the children's original removal from the home involves N.A.A.'s and J.M.A.'s continuing ambivalence about their eldest sons' sexual abuse complaints. In spite of strikingly similar accounts of abuse given by J.L.A. and B.M.A., who have not lived together since leaving their parents' custody, N.A.A. and J.M.A. refuse to acknowledge that any abuse could have occurred or to even discuss these allegations in counseling. Instead, they continue to assert that their sons were induced to make these allegations by representatives of the State. The parents' unwillingness to deal with this serious problem is a condition that prevents their children from being returned to their custody.

The reactions of the children regarding visitation with their parents also provide a basis for concluding that N.A.A. and J.M.A. have not remedied the problems that caused the children to be removed from their home. J.L.A. and B.M.A. become noticeably anxious and agitated when informed of their parents' planned visits, and their agitation continues sometimes for three weeks following visitation. Both boys have expressed fear of their parents and have expressed fear that N.A.A.

and J.M.A. might discover where they were living. B.M.A. has made frequent references to B.C. and has expressed concern that he too might be harmed. Visitation has only reinforced B.M.A.'s fears because N.A.A. has told him that he would be coming home soon and that he would be punished if he did not stop talking about her and if he did not recant the allegations of abuse. A.M.A.A. also became anxious after visits due to inappropriate conversations with her mother.

We acknowledge that N.A.A. and J.M.A. have tried to cooperate as best they can with the Department during the past six years. They have visited their children and have submitted to tests and counseling. However, we concur with the juvenile court's conclusion that their efforts have been insufficient. Therefore, we find that the record contains clear and convincing evidence that N.A.A. and J.M.A. have not adequately improved the conditions that led to the children's removal and that it is unlikely that they will be able to do so in the near future.

### III.

The juvenile court also determined that J.L.A.'s interests would be served best by enabling him to remain in state custody. It also determined that the interests of B.M.A., J.D.A., and A.M.A.A. would be best served by enabling them to be adopted by their foster families. We find that the record contains clear and convincing evidence to support this conclusion.

When J.L.A. was initially placed in foster care, he was developmentally delayed and behaved aggressively and violently. It was quickly determined that he had a low I.Q. stemming from the lack of intellectual stimulation rather than an inability to learn. He was extremely aggressive toward other children and adults and engaged in self-mutilation, including injuring himself with household objects and scratching himself with his fingernails until he bled. He was eventually institutionalized after being removed from two foster homes because of his aggressive behavior toward the other children in the home. Sadly, J.L.A. has spent the majority of his life being moved between nine separate foster homes and public care facilities.

The two younger boys, J.D.A. and B.M.A, were also developmentally delayed, hostile, and aggressive when they were first removed from their parents' home. The Department placed them in the same foster home where they have lived ever since.

B.M.A. displayed inappropriate sexual behavior toward dolls indicating that he had witnessed or been made a party to sexual acts by one of his parents. J.D.A. suffered from stress-related eating and drinking disorders, although these have improved over time.

The behavior of the three oldest children has improved significantly since June 1991. J.L.A. currently resides in a therapeutic foster home where he is receiving the care and attention necessary for his continuing psychological problems. He has made significant progress in that environment. With the help of nurturing foster parents and therapy, both B.M.A. and J.D.A. have improved significantly and have become much more well adjusted children. Both boys are doing well in school. B.M.A. plays football for his elementary school, where his younger sister, A.M.A.A., is a cheerleader for his team. Their foster parents are eager to adopt the two brothers.

A.M.A.A. has lived with her foster family since she was less than three months old. She is the only child who has grown up to be happy, outgoing, and well-adjusted. Supervised visits are the only exposure that A.M.A.A. has had to her biological parents. The record indicates that she has required some psychiatric care because of inappropriate conversations she has had with her mother during these visits. A.M.A.A.'s foster parents are eager to adopt her, and A.M.A.A. has expressed a desire to live with them permanently.

Six years have passed since these four children were removed from their parents' home. Since 1991, the children have had the opportunity to be integrated into stable and healthy homes. Based on our review of the record, we concur with the trial court's conclusion that it is time these children live in permanent homes and that their interests will be served best by permitting them to be adopted by their respective foster families.

## IV.

We affirm the judgment terminating the parental rights of N.A.A. and J.M.A. and remand the case to the juvenile court for whatever further proceedings may be required. We tax costs of this appeal to N.A.A. and J.M.A., jointly and severally, and their surety for which execution, if necessary may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.

_____
WILLIAM B. CAIN, JUDGE