IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 11, 2001

## STATE OF TENNESSEE v. JESSIE NELSON HODGES

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 6952      Joseph H. Walker, III, Judge**

---

### No. W2001-00871-CCA-R3-CD - Filed May 3, 2002

---

A Lauderdale County Grand Jury indicted the Defendant for robbery, and following a trial, a Lauderdale County jury convicted the Defendant of the offense charged. In this direct appeal, the Defendant presents the following issues for our review: (1) whether sufficient evidence was presented at trial to support his conviction; (2) whether evidence introduced at trial was illegally obtained in contravention of the Defendant's Fourth Amendment rights; (3) whether the Defendant was deprived of an "independent analysis of the evidence"; and (4) whether the trial court improperly instructed the jury. Finding no error in the record, we affirm the Defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Jessie Nelson Hodges, Pro Se (on appeal and at trial); and Julie Pillow, Assistant Public Defender (at trial), Ripley, Tennessee, for the Appellant, Jessie Nelson Hodges.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey Brewer, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

In June 2000, the Lauderdale County Grand Jury indicted the Defendant, Jessie Nelson Hodges, for robbery. Following a trial, at which the Defendant represented himself, a Lauderdale County jury convicted the Defendant of the offense charged. The trial court sentenced the Defendant as a Range III persistent offender to twelve years incarceration. In this pro se appeal as of right, the Defendant raises the following issues for our review: (1) whether sufficient evidence was presented at trial to support his conviction; (2) whether evidence introduced at trial was illegally obtained in contravention of the Defendant's Fourth Amendment rights; (3) whether the Defendant was deprived

of an "independent analysis of the evidence"; and (4) whether the trial court improperly instructed the jury. Finding no error in the record, we affirm the judgment of the trial court.

On February 23, 2000, the H & A Quick Stop, a convenience store in Halls, Tennessee, was robbed. Shirley White, manager of the H & A Quick Stop, testified at trial that the store is monitored by surveillance cameras, both inside the store and outside in the parking lot. White also reported that the convenience store is equipped with a silent alarm that can be activated by pushing an "emergency button" inside the store, and she stated that a phone is available for employee use behind the counter of the store. White further testified that the store has only one customer entrance in the front and an employee entrance in the back of the store, which is kept locked. White stated that she instructs each of her employees that if the store is ever robbed, the employee should "just back away . . . from the register . . . and let [the robber] have whatever [he or she] want[s]."

White recalled that at approximately 2:15 a.m. on February 23, 2000, she received a call from police, who reported that the H &A Quick Stop had been robbed. She stated that she responded to the call by driving to the store, where she met with police officers. White testified that when she arrived at the store, she saw numerous cigarette lighters and some paper on the floor near the cash register. White recalled that the cash register was open and "turned to the side," and she noted that there were "scratches on the counter where [the register had been] forcibly pulled around."

White reported that Connie Stevens was working "the late night shift" during the evening hours of February 22 and the early morning hours of February 23, 2000. She recalled that when she arrived at the store after the robbery, Stevens was very upset. She stated that she first tried to calm Stevens and then went into the store office to show the surveillance film to the three police officers who had responded to the alarm call. White reported that the entire robbery had been captured on surveillance video, which showed a man approach the counter and "jerk [the register] around" while Stevens "backed off." She stated that the man then "grabbed" money out of the register, leaving only a few dollars' worth of change in the cash drawer. White testified that she had not given the man seen on the video permission to take anything from the store.

Connie Stevens testified that she was working alone at the H & A Quick Stop at the time of the robbery. She stated that while she was at the store before her shift started, two black males came into the store to purchase gasoline. She recalled that one of the men was wearing a "work uniform[]." Stevens reported that later that night during her shift, between 1:30 and 2:00 a.m., one of the two men, whom she identified as the Defendant, returned to the store alone. She remembered thinking that his return to the store was "peculiar" because she did not see a vehicle in the front parking lot when the Defendant entered the store. Stevens testified that when he entered the store the second time, the Defendant was wearing a "denim black, rough-looking jacket" and a toboggan. She also stated that the Defendant appeared to be inebriated.

Stevens recalled that when the Defendant entered the store, he asked if he could get something to drink. Stevens responded, "Well, sir, do you have money?" When the Defendant responded that he did, Stevens told him, "you can get anything you want if you have money."

According to Stevens, the Defendant began to walk towards the beer cooler, but she told him that the store did not sell beer after midnight. Stevens testified that the Defendant then walked back to the front of the store and said, "Well, I need something to sober up. I need chocolate or something." Stevens reported that the Defendant picked up "a cake," brought it to the counter, and paid for the item. She recalled that she gave him one cent in change and that he said, "Thank you." Stevens testified that the Defendant then stood at the counter opening the wrapper on his cake. However, Stevens testified that when she opened the register drawer, the Defendant pulled the register toward him and began to remove all of the money from the drawer. Stevens testified, "[A]t first, it didn't occur to me that he was robbing me. I've never been robbed before, and then I just backed up and let him do his thing." She reported that in addition to the money, the Defendant took two money bags. Stevens stated that she guessed that the Defendant "stuffed [the money] in his coat pockets."

Stevens stated that the Defendant next demanded that she "jerk the phone out of the wall." She recalled that she first said, "You jerk the phone from the wall," but she eventually removed the phone cord from the phone and laid it on the counter. Stevens reported that the Defendant then told her to get him some beer. She stated that she walked to the beer cooler and removed a six-pack of Budweiser beer, but the Defendant, who had followed her to the beer cooler, said, "No, that ain't what I want. That is not what I want." According to Stevens, he took two or three twelve-packs of a different brand of beer and started to leave. On his way to the door, the Defendant stopped, picked up some cigarette lighters, and told Stevens to "give him five minutes to leave." The Defendant then left the store, taking the beer, money, the money bags, some cigarette lighters, and the phone cord. As the Defendant left the store, Stevens began to "steadily push[] the [alarm] button." Stevens stated that after the Defendant left, another man stopped to buy gasoline, and shortly thereafter, the police arrived.

Stevens testified that during the robbery, the Defendant was "loud," and she maintained that he "scared [her]." She testified, "I didn't know if he had a gun [or] if he had a knife . . . . He didn't pull a weapon on me, . . . but . . . . [h]e had his hands in his pocket." She stated, "I, honest to God, was standing there thinking, 'If he shoots me, I hope he shoots me in my chest or in my arm or something and not in my head.'" Stevens recalled that she "couldn't get to" the alarm button while the Defendant was removing money from the cash register. She testified that she thought she pushed the alarm button not only when the Defendant was exiting the store, but also at some point during the robbery. Nonetheless, she maintained that she pushed the button "as soon as [she] got the chance."

Stevens testified that she was certain that the man who robbed H & A Quick Stop was the Defendant. She stated that after the crime, she identified the Defendant as the robber in a photographic line-up. She also identified the Defendant in court using the video surveillance tape made of the crime, which was shown to the jury.

Jonathan Gay, Director for 911, introduced into evidence an audio recording of a 911 call made by an unknown male who reported the robbery in this case. The recording was played for the jury. Gay also testified that 911 received a silent alarm call from H &A Quick Stop, via Automatic

Security, in the early morning hours of February 23, 2000. Gay stated that the call from Automatic Security was received at 2:14 a.m. and that the call from the unknown individual was received at 2:16 a.m. The audio tape of the 911 call, which was played for the jury, indicated that an officer arrived at the scene of the robbery at 2:17 a.m.

Officer Roy Smith of the Halls Police Department testified that he was on duty in the early morning hours of February 23, 2000 when he received a "panic alarm call" from dispatch. He stated that he responded to the call and arrived at H & A Quick Stop approximately five minutes later. Smith testified that when he arrived at the store, he encountered Connie Stevens, who was upset and crying. She told Smith that the store had just been robbed. Smith recalled that "[t]here was debris all over the floor [and that] the cash register had been spun around and opened." Smith reported that approximately $300 had been taken from the register. Smith stated that he and other officers secured the crime scene and called investigators.

On cross-examination, Smith testified that Stevens appeared to be frightened when he arrived. He recalled that Stevens told him that "a black male" had robbed her and that "he had his hand in his pocket like he had a gun or something, but he never showed the gun." Smith also recalled that Stevens reported having seen the robber in the store earlier that evening.

Maurice Ward testified that on February 22, 2000, he finished work at 3:00 p.m. and went to a friend's house to play dominoes. There, he met the Defendant. Later that afternoon, he agreed to give the Defendant a ride to the Defendant's home. Ward stated that he and Defendant began to "rid[e] around drinking." He reported that they stopped by the H & A Quick Stop to buy gasoline and beer; Ward stated that he was still wearing his work uniform at the time. Ward testified that after leaving the store, he and the Defendant "parked" and talked. They later drove to a motel between Dyersburg and Halls, where the Defendant was reportedly living at the time, and then to the Defendant's mother's house. According to Ward, the Defendant obtained $20 from his mother while at her house.

Ward testified that after they left the house, the Defendant began to talk about "robbing a place," and Ward "tried to talk him out of it." Ward stated that the Defendant then said, "Well, take me back to the gas station and I'm just going to get a beer." Ward testified that he again drove the Defendant to H & A Quick Stop. When they arrived, Ward parked in the back of the store by the telephone while the Defendant went inside to purchase beer. Ward recalled that the Defendant returned with three cases of beer, which they put in the back seat of the car. Ward stated that when he began to drive away, the Defendant "grabbed the steering wheel" to force Ward "to go the back way." Ward stated that this frightened him.

Ward testified that he did not realize that the Defendant had robbed the convenience store until the Defendant began to throw items out of the car window after they had driven about a half of a mile away from the store. Ward reported that the Defendant threw out a phone cord and two empty money bags, which he had emptied onto the floorboard of the car. Ward estimated that the

bags contained around $300. He stated that the Defendant spent the money on cocaine, which he and the Defendant consumed together.

Ward testified that he pled guilty to facilitating the robbery. He stated that after the crime, he received a letter from the Defendant dated June 19, 2000. Ward testified that in the letter, which was introduced as an exhibit at trial, the Defendant asked Ward to "say that [they] don't know each other." On cross-examination, Ward admitted that he had been convicted of aggravated burglary and burglary. He also admitted that he had been diagnosed as having hallucinations. However, he maintained that "[e]ven though [he] had been drinking [on the night of the crime], [his] mind still was clear," and he knew "who robbed that place." Ward reported that the Defendant told him "he [would] have [Ward's] family killed." On redirect examination, Ward testified that the Defendant told him that he had robbed "quite a few" places.

Joe Hardy, a former investigator with the Halls Police Department, testified that he investigated the robbery in this case. He stated that he received a call at 2:30 a.m. on February 23, 2000 indicating that the H & A Quick Stop had been robbed. He stated that when he arrived at the store, "there was stuff off the counter in the floor and laying around everywhere." Hardy testified that he spoke with Connie Stevens, whom he described as "hysterical . . . , . . . crying and excited." Stevens told Hardy that "a black male" had robbed the store. Hardy summarized the information about the robbery that he obtained from Stevens on the night of the crime as follows:

> [Stevens] told me that a black male had entered the store . . . from the west side of the building . . . and that he wanted to buy some beer and she told him he couldn't because it was past 12:00. And he asked where the chocolate was and . . . he . . . went over to the chocolate and finally picked up a cake. . . . [S]he rang it up and it was 86 cents. And she opened the [register] drawer and gave him his change back, and at that point he reached out and grabbed the drawer and got all the money – bills out of the drawer and made her go back to the beer cooler and get . . . some beer and she said she gave him some beer and he said that's not what he wanted and then he went into the beer cooler and got, I think it was, two more cases of beer . . . and proceeded to the front of the store and she stood . . . .
>
>      . . . back behind the beer cooler . . . . and [she] said that when he come [sic] to the front, . . . he bent over and picked up some cigarette lighters from the floor and told her to give him five minutes before she called anybody. And while he was leaving she pushed the panic alarm on the door. They have a little button that they wear that's a panic alarm. She didn't have it on. She had it laying under the counter.
>          . . . .
>      And she also said that he asked her where the phone was and that she pointed
> to it. And he told her to jerk it out of the wall and give him the cord . . . .

Hardy testified that the phone cord was missing from the phone when he arrived at the store. Hardy also testified that Stevens had told him that she remembered seeing the robber at the store earlier that evening with another black male.

Hardy testified that when he viewed the surveillance tape of the robbery, he recognized the robber as the Defendant. He stated, "I'm familiar with [the Defendant]" and reported that he had known the Defendant for some time. Hardy testified that he took the surveillance tape made on the day of the robbery to the University of Tennessee at Martin and "[m]ade a framed tape" containing only footage of the Defendant and Ward entering the store on the evening of the robbery and footage of the actual robbery. He stated, "When I got to the point where people were in the store, I tried to slow [the tape] down enough to [show] a still picture of each frame that was there on the tape." Hardy showed the edited surveillance tape to the jury. While the jury watched the video, Hardy pointed out that the Defendant was wearing a black and tan jacket when he first entered the store on the evening of the crime and later that night during the robbery. Hardy also introduced into evidence a still photograph of the robber taken from the video tape. Hardy further testified that he conducted a photographic line-up at which Connie Stevens identified the Defendant as the robber. Hardy reported that police did not dust for fingerprints at the scene of the crime because they felt it was not necessary; he stated that the officers instead relied upon the "[d]efinite ID, hundred percent, off the video."

Hardy stated that police arrested the Defendant on the day after the robbery. He testified that the Defendant refused to sign a waiver form or make a statement to police. Hardy testified that after his arrest, the Defendant asked officers to tell his mother that he had been arrested. Hardy therefore went to the home of the Defendant's mother to communicate this information. While he was speaking with the Defendant's mother, Hardy noticed a jacket which appeared to be the jacket worn by the robber on the night of the crime hanging on a door frame inside the home. The Defendant's mother identified the jacket as belonging to the Defendant and allowed the officers to take the jacket.

Hardy testified that police were able to identify Maurice Ward by talking to Ward's employer. He explained that Stevens remembered the logo on Ward's work uniform, indicating where he worked. Police went to Ward's place of employment, where they provided Ward's employer with a description of the person accompanying the Defendant on the night of the robbery and a description of the car seen on the night of the robbery. Based on the descriptions, the employer identified the man as Maurice Ward. The officers arrested Ward and took a statement from him on February 26, 2000.

In his defense, the Defendant called Joe Purcell, Chief of Police for Halls, Tennessee. Purcell testified that the police take fingerprints only when they "have no other evidence to go on." He stated that in this case, the Halls police "didn't feel [that they] needed the fingerprints." Purcell also testified that he recognized the Defendant as the robber on the surveillance tape. On cross-examination, Purcell stated that he was "a hundred percent" certain that the Defendant was the man who robbed the H & A Quick Stop.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant challenges the sufficiency of the convicting evidence. He avers that the evidence presented at trial was insufficient to convince any rational trier of fact that he was guilty

-6-

of the offenses charged beyond a reasonable doubt. See Tenn. R. App. P. 13(e). The Defendant thus contends that the trial court erred by denying his motion for judgment of acquittal and his motion for new trial.

When a trial court considers a motion for judgment of acquittal, its sole inquiry is whether the convicting evidence is legally sufficient. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). The court may not weigh the evidence in reaching its determination. Id. An appellate court must apply this same standard when reviewing the denial of a motion for judgment of acquittal. Id.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of robbery, which is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). The following evidence was presented at trial to support the Defendant's conviction: Connie Stevens testified that the Defendant entered the convenience store while she was working, jerked the cash register towards him, and took all of the money contained in the register. She stated that the Defendant also took three cases of beer and some cigarette lighters. She testified that the Defendant then ordered her to remove the phone from the wall and left the store, taking the phone cord with him. Stevens maintained that she was frightened of the Defendant during the robbery because he was loud and because he had his hand in his pocket, leading her to believe that he was armed. The manager of the store and officers who investigated the robbery testified that the cash register had been forcibly turned around, leaving scratches on the counter where it sat. The robbery was captured on surveillance tape, which was shown to the jury. Stevens identified the

Defendant at trial, both in person and using the surveillance video, as the robber. Stevens also identified the Defendant in a photographic line-up after the crime. In addition, two officers who investigated the case stated that they each knew the Defendant and could positively identify him as the robber. Finally, Maurice Ward testified that he was with the Defendant on the night of the crime and stated that the Defendant robbed the convenience store. He reported that the Defendant took approximately $300 and other items from the store. This is clearly sufficient evidence to support the Defendant's conviction. We conclude that this issue is without merit.


## II. FOURTH AMENDMENT VIOLATION

The Defendant argues Officer Joe Hardy acted in violation of his Fourth Amendment rights by taking his jacket from his mother's home. However, the record indicates that this issue is being raised for the first time on appeal. The record does not contain a motion to suppress the evidence now contested on appeal, and it does not appear that the trial court held any type of suppression hearing concerning this matter. Because the Defendant failed to "take whatever action was reasonably available to prevent or nullify the harmful effect" of admission of this evidence at trial, we may not grant relief. Tenn. R. App. P 36(a). Furthermore, this issue was not included in the Defendant's motion for new trial. This issue is therefore waived. See Tenn. R. App. P. 3(e). Finally, we conclude that even if the trial court erred in admitting evidence of the jacket, any such error was harmless in light of the overwhelming evidence of the Defendant's guilt. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## III. "INDEPENDENT ANALYSIS OF THE EVIDENCE"

The Defendant argues that he "was entitled to an independent analysis of the evidence and proof put on by the state in presentation of it's [sic] case." Although his argument is somewhat unclear, it appears that the Defendant contends that he should have been allowed an "independent analysis [by] a video and technical specialist" of the video surveillance tape in this case. The Defendant also complains that officers conducting the investigation in this case did not obtain fingerprints from the scene of the crime. He states, "The taking of fingerprints is evidence yet the officer conducting the investigations in the case at bar were left to feel as though no science was required to prove their case before the court." It appears that he further complains that the police officers did not retrieve or "put to scientific examination" the two money bags and the phone cord that were thrown out of Maurice Ward's car following the crime. In his brief, the Defendant states, "[T]he police . . . actually failed to conduct an investigation at all . . . ."

We first note that it does not appear from the record that the Defendant ever requested outside review or analysis of the tape prior to or during trial. Thus, the issue is now waived on appeal. See Tenn. R. App. P. 36(a). The Defendant's remaining arguments with regard to this issue appear to concern the sufficiency of the evidence, which we have already addressed. Finally, this issue was

-8-

not included in the Defendant's motion for new trial and is thus waived.  <u>See</u> Tenn. R. App. P. 3(e).

## IV.  JURY INSTRUCTIONS

The Defendant raises three issues pertaining to the jury instructions in his case.  However, he has failed to include a transcript of the jury instructions in the record on appeal.  It is the appellant's duty to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court so as to allow a meaningful review on appeal.  <u>See</u> Tenn. R. App. P. 24(b); <u>State v. Ballard</u>, 855 S.W.2d 557, 560 (Tenn. 1993).  When the record is incomplete and does not contain information relevant to an issue presented for review, this Court is precluded from reviewing the issue and must presume the correctness of the trial court's ruling.  <u>State v. Gibson</u>, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997); <u>State v. Roberts</u>, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).  We are therefore unable to address the Defendant's claims pertaining to jury instructions.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE