IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 15, 2020 Session

## STATE OF TENNESSEE v. DWAYNE EDWARD HARRIS

**Appeal from the Circuit Court for Williamson County
No. II-CR180114-B  Deanna B. Johnson, Judge**

_____

### No. M2019-01609-CCA-R3-CD
_____


A Williamson County jury convicted the Defendant, Dwayne Edward Harris, of joyriding (Count 1), carjacking (Count 2), and aggravated robbery (Count 3).  In response to a motion for judgment of acquittal, the trial court reduced Count 3 from aggravated robbery to robbery.  The trial court then merged Count 1 and Count 3 into Count 2, and sentenced the Defendant to an effective sentence of thirty years in the Tennessee Department of Correction.  The Defendant appeals, asserting: (1) the evidence is insufficient to support his convictions; (2) the trial court improperly admitted evidence; and (3) a *Bruton* violation.  The State appeals the trial court's reducing the jury's conviction for aggravated robbery in Count 3 to robbery and the trial court's merging Count 3 into Count 2.  This court consolidated the Defendant's and the State's appeals.  After review of the Defendant's issues, we discern no error.  As to the State's issues on appeal, we vacate the trial court's judgment in Count 3, reinstate the jury's verdict of guilty of aggravated robbery, and remand for sentencing on Count 3.  The trial court's judgment in Count 2 is remanded for corrections consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Vacated in Part, and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined.  THOMAS T. WOODALL, J., not participating.

Nichole Dusche (on appeal), and Terrance McNabb (at trial), Franklin, Tennessee, for the appellant, Dewayne Edward Harris.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Tammy Rettig, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

This case arises from a carjacking and robbery that occurred on July 27, 2017, in Williamson County, Tennessee. A Williamson County grand jury indicted the Defendant, Barry Harris,[1] Dejon Gullatt, and Alexzandrea Oden for their roles in these crimes. Co-defendants Gullatt and Oden were severed and appeared as State witnesses at the Defendant and Barry Harris's joint trial. The Defendant and Mr. Harris were tried for the charges of: carjacking by use of a deadly weapon (Count 1), carjacking by force or intimidation (Count 2), and aggravated robbery accomplished with a deadly weapon (Count 3). The State proceeded under, and the jury was charged with, the theory of criminal responsibility as to the culpability of both the Defendant and Mr. Harris.

### A. Trial

At the time of the trial, Chantelle Dodson ("the victim") was nineteen years old and lived in Franklin, Tennessee with her mother. The victim had been friends with Alexzandrea Oden since middle school and knew DeJon Gullatt[2] as Ms. Oden's boyfriend. The victim was familiar with Mr. Harris through social media and had seen Mr. Harris "around stores." Ms. Dodson had never seen or heard of the Defendant before these events but later learned he used the nickname "Big Homey."

The victim recalled events that occurred in July of 2017. Several days before the carjacking and robbery, Ms. Oden called the victim to ask for a ride. The victim drove Ms. Oden to a house located on Scruggs Avenue in the Rolling Meadows subdivision. She parked at the end of the driveway, and Ms. Oden exited the back seat of the victim's 2006 Altima and walked to the house. The victim and her boyfriend, Timothy Marsh, waited in the car while Ms. Oden retrieved a big package. Ms. Oden entered the back seat of the car complaining about the large size of the package. The victim informed Ms. Oden that the package was blocking her view through the rearview mirror, so Ms. Oden opened the package and removed the contents, disposing of the shipping box. The victim described the contents as a smaller package ("the box") wrapped in brown paper and clear tape. When Ms. Oden re-entered the backseat of the Altima with the box, the victim smelled an odor consistent with raw marijuana.

---

[1] While the Defendant and Barry Harris share a surname, it is unclear from the record whether they are related.

[2] The indictment spells DeJon Gullatt's last name "Gullat." At trial, when Mr. Gullatt testified, he spelled his name aloud "Gullatt"; therefore, we use his spelling throughout this opinion.

The victim testified that, after leaving Scruggs Avenue, Mr. Marsh and Ms. Oden directed her to an unfamiliar area of Nashville with multiple buildings. The victim parked her Altima in a parking lot. Ms. Oden concealed the box in an overnight bag, and Mr. Marsh and Ms. Oden took the bag into one of the buildings. Ms. Oden and Mr. Marsh remained inside the building for about thirty minutes and returned to the Altima without the box. Next, the victim drove Ms. Oden to a residence in Nashville where Ms. Oden stayed for the night. The victim and Mr. Marsh drove to a restaurant for dinner and then to a hotel where they spent the night.

The next day, the victim drove Ms. Oden from the Nashville residence where they had left her the night before to Ms. Oden's grandmother's home in Cherokee Place ("Cherokee Place residence"). The victim admitted she had concerns about who owned the box, her involvement, and why Mr. Marsh had gone into the building with Ms. Oden; however, she had just graduated from high school and was enjoying summer vacation, so set her concerns aside until several days later when she and Mr. Marsh went bowling.

While at the bowling alley, a police officer approached her and informed her that her Altima had been reported as involved in a drug transaction. The victim walked out to the bowling alley parking lot with the officer, who searched the victim's car and Mr. Marsh. The officer arrested Mr. Marsh for outstanding warrants and issued a citation to the victim for a small amount of marijuana in the car. The victim identified the citation and read aloud a portion of what the police officer had written: "officer responding to a report of drug activity in the parking lot of 1200 Lakeview Drive, occurring in a blue Nissan Altima." The victim arranged for her sister, Shabree Dodson ("Shabree")[3], to pick her up from the bowling alley because the police officer had advised her that she could not drive alone with a learner's permit.

Following Mr. Marsh's arrest, the victim began making arrangements to post bail for his release from jail. The victim was troubled because she knew the report identifying her vehicle was false. As she attempted to secure bond for Mr. Marsh, the victim learned that she would be required to secure a cosigner for the bond. The victim sought Ms. Oden's help and, after a thirty to forty-minute delay, Ms. Oden agreed to help. The victim drove to the Cherokee Place residence to meet Ms. Oden. The victim recalled having her purse containing the money to post bail, along with her cell phone and Mr. Marsh's cell phone.

The victim parked in front of the Cherokee Place residence and two men approached the victim's car. Ms. Oden's boyfriend, Mr. Gullatt, reached inside the passenger window, unlocked the door, and got into the car. He put a silver pistol to the

---

[3] Because Shabree shares the same last name as the victim, we use her first name for clarity.

victim's head and demanded "everything that [she] got." He also asked the victim about the location of the box. The Defendant, who stood on the driver's side of the car, grabbed the victim by her hair and pulled her out of the car and began striking her face with his hands. Once he let go of her, the victim began backing toward the house. She recalled both men wore black clothing. She described the Defendant as heavy set and bald and Mr. Gullatt as tall. She had parked near a street light which assisted in her ability to clearly view the men. The victim also saw a third person, Mr. Harris, standing across the street. She described him as "stand-offish." She explained that it appeared to her that Mr. Harris did not want to be involved because he did not do or say anything during the exchange. Mr. Harris walked away from the Cherokee Place residence, and Mr. Gullatt drove away in the victim's Altima. The victim did not see where the Defendant went following his attack on her.

The victim fled into the house and called out for Ms. Oden. She told Ms. Oden that she had been carjacked and asked her to call the police. Ms. Oden appeared "shocked" and kept repeating "sorry." The victim recalled that she was shaking and crying while Ms. Oden was on the phone with the police. Ms. Oden hugged the victim and tried to reassure her. After ten to fifteen minutes with no police response, the victim began to question whether Ms. Oden had actually called the police. The victim called her sister, Shabree, who arrived approximately twenty minutes later and waited with her for the police. At some point, Shabree expressed to the victim doubt about whether Ms. Oden had called the police. Shabree went outside and saw a police officer driving down the street. She stopped him and told him about the carjacking. The officer accompanied Shabree into the house where he spoke with the victim.

The victim testified that, as a result of the Defendant's assault, she had bruising on her arms and a cut on her face. The police officer called for medical assistance and additional officers to assist in the investigation. Police spoke with both the victim and Ms. Oden, and medical technicians treated the victim's injuries. The victim identified photographs of the injuries she sustained during her interaction with the Defendant. After medical treatment, the victim agreed to provide a statement at the police station. The police later recovered and returned the Altima to the victim, however, the stolen money and cell phones were not recovered.

The victim testified that she later described to Shabree, in detail, the man who had pulled her out of the car and hit her. Using this information, Shabree tried to learn the identity of the assailant. At some point, Shabree showed the victim a photograph with several people depicted. One of the people in the photograph was the Defendant, who the victim described as "the dude that actually put his hands on me." Before seeing the photograph, the victim did not know the Defendant or know his name. When asked about the certainty of her identification of the Defendant in the photograph, the victim

stated, "I was very confident about it." Shabree sent the photograph to Detective Bobby Dilworth, and the victim later confirmed with the detective her identification of the Defendant in the photograph.

On cross-examination, the victim clarified that Mr. Gullatt hit her "with something" on the right-side of her face causing her to bleed. The victim confirmed that Mr. Gullatt "racked a round into the chamber of the gun" causing her to fear that he was going to shoot her. When Mr. Gullatt inquired about the location of the box, the victim told him to ask Ms. Oden. The victim agreed that had the Defendant not pulled her out of the car, Mr. Gullatt could have shot her. She confirmed that she did not see the Defendant drive away in her car and that he did not physically take her belongings from her. The victim testified that she later learned that Ms. Oden had not called the police and "essentially set [her] up in this matter."

Shabree testified about her involvement in the case. When she arrived at the Cherokee Place residence, the victim was seated on the porch with her face bleeding. Shabree described the victim as crying, nervous, and shaken. Shabree grew suspicious when police still had not arrived. She estimated that it took her approximately twenty-five minutes to get to the Cherokee Place residence. As they waited, Shabree saw a police officer patrolling the area and asked him if he was responding to Ms. Oden's report. He told her no report had been made.

At the time of these events, the victim did not know the Defendant's identity. The victim described her assailant's appearance to Shabree, who began speaking with others about the identity of the victim's attacker. Regarding how she obtained a photograph of the Defendant, Shabree said, "word get[s] around Franklin pretty quick and discussed [by] family members and they end[ed] up sending me a picture of one of the guys who did it." Shabree texted this photograph to the victim, and the victim identified the Defendant in the photograph as her attacker. Shabree then sent the photograph to Detective Bobby Dilworth. She read aloud the three text messages she sent to Detective Dilworth with the photograph as follows:

Message 1:   "The big guy to the right."
Message 2:   "[M]y sister said he is the one who hit her."
Message 3:   "[S]he is a 100 percent sure."

City of Franklin Detective Bobby Dilworth responded to a report of a carjacking and robbery that had occurred in Cherokee Place. After speaking with the initial officer on the scene, he arranged for patrol officers to transport the victim and Ms. Oden to the police department for interviews. The women were placed in separate rooms, and Detective Dilworth spoke to the victim first. He recalled that the victim was visibly

injured and would tear up throughout the interview. He noticed a laceration above her right eyebrow and bruising and abrasions on her arms. The victim reported the events consistent with her initial statement to the police at the scene. The victim identified two of the three suspects by name, but she did not know the identity of the third man who pulled her from the car by her hair. She described the men as wearing black clothing. She reported losing money, two cell phones, and her car during the exchange with the men.

Next, Detective Dilworth interviewed Ms. Oden. After speaking with the victim, Detective Dilworth did not believe Ms. Oden was an active, physical participant in the attack, but he suspected some level of involvement. According to Detective Dilworth, the details the victim provided indicated that the acts were not random and that the victim had been "targeted." Ms. Oden identified Mr. Gullatt as one of the participants. Detective Dilworth obtained permission and then searched Ms. Oden's cell phone to determine whether she had placed a 911 call on the victim's behalf. The call log did not contain any 911 calls or calls placed to the non-emergency police number. He did, however, find other numbers that were called during the timeframe of the incident. Detective Dilworth identified a photograph he took of Ms. Oden's cell phone call log. During the course of his investigation, Detective Dilworth discovered that one of the four phone calls shown in the call log for the relevant time period was to Mr. Gullatt's phone number.

Following the interviews, Detective Dilworth obtained an arrest warrant for Barry Harris and DeJon Gullatt. Detective Dilworth reiterated that he questioned Ms. Oden's role after his interview with her and his suspicions were confirmed when he spoke with Mr. Gullatt. As part of his investigation, Detective Dilworth learned that Mr. Marsh was arrested as a result of a report of suspicious activity involving drugs at the bowling alley. He also learned that Ms. Oden was the person who had reported the drug activity to the police. He explained that Ms. Oden's cell phone number was populated in the police CAD system through computerized dispatch. He also reviewed the 911 recording of the call reporting an alleged crime at the bowling alley.

The investigation included interviews with the victim, Ms. Oden, Mr. Marsh, Leon Rice, Sherrita Russ, and Denzel Robertson, who had "strong ties" to the Scruggs Avenue residence. Detective Dilworth also confirmed that packages, shipped from California, were delivered to the Scruggs Avenue residence. One package was delivered on July 12, 2017, and the other was delivered on July 22, 2017. Detective Dilworth's testimony about his interactions with Shabree was consistent with Shabree's trial testimony.

City of Franklin Police Department Detective Sergio Guerra conducted a forensic examination of Barry Harris's cell phone with the use of a program called Cellebrite. He

identified the report of the information transferred from Mr. Harris's cell phone to Cellebrite. He reviewed numerous text message exchanges between Mr. Harris's cell phone and someone listed in his contacts as "Big Homey." The Cellebrite report of the content on Mr. Harris's cell phone showed that "Big Homey" was the sixteenth most contacted contact out of 279 contacts. The total number of text messages for the contact "Big Homey" was 119.

Franklin Police Department Detective Elijah Valimont processed a recovered vehicle located on Chickasaw Place. He explained that Chickasaw Place was a road that runs parallel to Cherokee Place and the two roads are divided by Shawnee. When he arrived, he found a blue Nissan Altima parked toward the dead end of Chicksaw. The car had been reported stolen during a carjacking/robbery and was located a short distance from the robbery location. It appeared to Detective Valimont that nothing of value had been taken from the Altima. He elaborated, stating that wallets, purses, a "Smart watch," and the car radio were in the car and undamaged.

Ms. Oden testified about her relationship with each of her co-defendants and the victim. Ms. Oden was in a romantic relationship with Mr. Gullatt, both at the time of the incident and at the time of the trial, and, before this incident, she considered herself friends with the victim. As to the Defendant and Mr. Harris, Ms. Oden stated, "I know of [them]." Ms. Oden explained that the victim, Mr. Marsh, and she were driving to Franklin from Nashville when Mr. Gullatt, who was in Ohio at the time, called and asked her to retrieve a package containing shoes from a residence in Rolling Meadow. She recalled the seating arrangement in the victim's Altima as they drove to Rolling Meadow. The victim drove, Mr. Marsh sat in the front passenger seat, and Ms. Oden sat in the back seat.

Ms. Oden stated that she was unable to find the package inside or outside of the residence. She returned to the backseat of the victim's Altima, and Mr. Gullatt called to tell Ms. Oden that the package did not contain shoes but "a whole bunch of other stuff." As she was listening to Mr. Gullatt, Mr. Marsh began unpacking the package. She did not know where or how Mr. Marsh found the package, but she guessed that UPS might have delivered it while she was inside the Rolling Meadow residence. She described the package as medium in size and too large for shipping a pair of shoes. She confirmed that the package would easily fit inside a car, and she said that its contents "[d]id not smell like anything."

Mr. Marsh unpacked the package and displayed the box, which Ms. Oden described as a saran-wrapped package. She estimated the box weighed three or four pounds and contained marijuana, a gun, and "several other drugs." When asked how she knew the items were drugs, she responded, "Because [Mr. Marsh] was pulling them out."

She described the gun as small and black. She said one of the drugs "looked like glass," another "like a brick" that was white in color, and the marijuana was in a clear bag. All of these items remained in the front seat with Mr. Marsh, who directed the victim where to drive next.

Ms. Oden testified that she was scared because she was not familiar with Mr. Marsh, and she had never before been in this type of situation. The victim drove to a building on Jefferson Street in Nashville, near Tennessee State University. Mr. Marsh exited the Altima with the items and went inside the building for fifteen to twenty minutes while the victim and Ms. Oden waited in the car. During this time, Ms. Oden suggested to the victim that they "shouldn't [be] involved," but the victim only listened to Mr. Marsh and followed his direction. Ms. Oden also encouraged the victim to leave. When Mr. Marsh returned from the building, he had "some" marijuana, the white brick, and the gun. Mr. Marsh told the victim to drive to a motel where he rented a room for the night. All three stayed at the motel that night, and Mr. Marsh gave the drugs to four or five different people who came to the room. According to Ms. Oden, Mr. Marsh told these people that he wanted money for the drugs but he received nothing in return for the drugs. She described Mr. Marsh as separating the drugs, weighing them, and putting the drugs in different bags for the purpose of selling the drugs. Ms. Oden said that Mr. Marsh and the victim stayed in the room for several nights but that she stayed with them only one night.

The following morning, the victim drove Mr. Marsh to a residence in Nashville and then drove Ms. Oden to the Cherokee Place residence where Ms. Oden lived with her grandmother. After returning home, Ms. Oden spoke with Mr. Gullatt on the telephone. Mr. Gullatt told her that the Defendant was threatening to kill Ms. Oden and her family if Mr. Gullatt did not return to Tennessee from Ohio. Several days later, Mr. Gullatt called Ms. Oden and told her he was returning to Tennessee. He instructed her to "get dressed" and that he would notify her when he arrived. Ms. Oden dressed and arranged for her grandmother to take care of her son. When asked why she needed to make childcare arrangements, Ms. Oden testified "[b]ecause I was told that I might have to do something with them just to make sure that we would all be safe." Ms. Oden did not know specifically to what Mr. Gullatt referred when he told her this, but she knew that Mr. Gullatt was relaying the Defendant's instructions. Ms. Oden complied because she was concerned for the safety and welfare of her children and family.

Ms. Oden testified that, when Mr. Gullatt arrived, he received a phone call from the Defendant. Mr. Gullatt placed the phone call on speaker, and Ms. Oden heard the Defendant tell Mr. Gullatt that Ms. Oden had to comply with his instructions in order to remain safe. Mr. Gullatt told Ms. Oden they needed to create a situation to separate Mr. Marsh and the victim. Ms. Oden's role was to make a police report. Ms. Oden explained

that, even though Mr. Gullatt told her to make the call to the police, it was an instruction that came "through his associates." About separating the victim and Mr. Marsh, Ms. Oden explained that the men did not think the victim would be truthful unless separated from Mr. Marsh because Mr. Marsh abused the victim. Ms. Oden called the police and reported a drug deal in the parking lot of the bowling alley. Mr. Gullatt provided Ms. Oden with specific information about the victim and Mr. Marsh that she related to the police. She told the police what Mr. Marsh and the victim wore, a description of the drugs, and a description of the car. Ms. Oden also provided a false name to the police because she did not want her name associated with the incident. Ms. Oden confirmed that it was her voice on the recording of the call.

Ms. Oden's recorded phone call with police dispatch was played for the jury, and Ms. Oden identified false information that she provided to the police dispatch. She explained that the Defendant, while on the phone with Mr. Gullatt, instructed her on what to tell police dispatch. Mr. Gullatt told Ms. Oden when to discontinue the phone call and turn off her phone.

Ms. Oden testified about an earlier encounter with the Defendant to explain her complicity in the false report. She explained that the day before Mr. Gullatt returned to Tennessee from Ohio, the Defendant appeared at her neighbor's house. She had never seen him before, and he asked her if she had any of the contents of the box. Mr. Harris was with the Defendant, and she told them that she did not have anything from the box nor did she know the whereabouts of the box. Ms. Oden went inside her home and, while preparing to bathe her son, the Defendant told Ms. Oden's grandmother that if Ms. Oden did not find "his stuff" he would return and kill Ms. Oden. After speaking with Ms. Oden's grandmother, the Defendant and Mr. Harris drove by the residence several times but did not stop. Ms. Oden was frightened and wondered how the Defendant knew who she was and where she lived.

After placing the phone call to the police, Mr. Gullatt and Ms. Oden waited for the Defendant to pick them up at the Cherokee Place residence. The Defendant drove a silver Envoy; Mr. Harris sat in the front passenger seat, and Mr. Gullatt and Ms. Oden sat in the back seat. No one spoke on the drive to the bowling alley where they parked in front of a nearby tattoo parlor and watched the police in the bowling alley parking lot. While they sat in the car, Mr. Harris removed a silver gun from his waistband and gave it to Mr. Gullatt. The Defendant told Mr. Gullatt that if Mr. Marsh was not arrested "[Mr. Gullatt] knew what he was going to have to do." Mr. Gullatt took the gun and laid it on the car seat between him and Ms. Oden. Ms. Oden recalled that Mr. Marsh had disclosed to her that he had an outstanding warrant in Davidson County. Ms. Oden believed that, because of the outstanding warrant, there was a good chance the police would arrest Mr. Marsh thereby successfully separating him from the victim.

Ms. Oden testified that the Defendant followed the victim as she drove away from the bowling alley alone in her car. No one in the Envoy spoke as they followed the victim to her mother's residence. The Defendant parked a short distance away, and Mr. Harris and Mr. Gullatt exited the car and walked toward the residence. Ms. Oden noted that Mr. Gullatt left the gun on the car seat next to her. The men returned and notified the Defendant that the victim was leaving. Again, they rode in silence as they followed the victim to the police station. They parked next to the victim in the police station parking lot and waited as the victim sat in her car alone talking on her cell phone. During this time, the Defendant told Mr. Gullatt that "he was going to be okay" and that the Defendant knew that Mr. Gullatt did not have "it." Ms. Oden heard the Defendant tell Mr. Gullatt that "he wasn't going to have to do anything else" and also that he "might have to get [his] hands dirty." They remained in the parking lot only two or three minutes before driving away.

After leaving the police station, the Defendant drove back to the victim's residence and parked on an adjacent street to wait for the victim to return. While they waited, the Defendant reiterated to Mr. Gullatt and Ms. Oden that they would be "okay" and said that he would drive them home. No one else spoke and eventually the Defendant tired of waiting for the victim and drove Mr. Gullatt and Ms. Oden to the "old hospital." From there, Mr. Gullatt and Ms. Oden walked to the Cherokee Place residence. During the ten to fifteen minute walk, Ms. Oden turned her phone back on, and the victim called Ms. Oden's cell phone asking for help with Mr. Marsh's bond.

Ms. Oden did not want to help the victim, so she told the victim that she was unsure whether she could find childcare for her son. The victim, however, kept calling the cell phone even after Ms. Oden had returned the cell phone she had been using that night to her aunt. As Ms. Oden was preparing to go to bed, her aunt told her that the victim would be outside shortly. Ms. Oden asked her aunt why the victim was coming over, and her aunt told Ms. Oden that she had told the victim to come over because the victim kept calling her phone. Ms. Oden said that Mr. Gullatt had not come inside the house with her after the walk from the hospital, and she did not know where he was at this time. Ms. Oden did not go outside to meet the victim, however, the victim "busted through our door" and told Ms. Oden that "some big dude" and Mr. Gullatt had attacked her and stolen her car. The victim also identified Mr. Harris as being present.

Ms. Oden described the victim as "frantic," and she observed a scratch on the victim's cheek. Initially, the victim told Ms. Oden that Mr. Gullatt "pistol-whipped" her, but the victim later denied this and said that Mr. Gullatt had held her at gunpoint. Ms. Oden denied that the victim asked her to call the police. She said that the victim requested a phone to call her sister, Shabree. Ms. Oden's aunt, however, asked Ms. Oden

- 10 -

to call the police. Ms. Oden did not want to call the police because she feared for her family's safety, so instead she pretended to call the police. After faking the call, she told the victim the police were on their way. Ms. Oden said that the victim's sister arrived shortly before the police.

Ms. Oden testified that she did not see Mr. Gullatt until several months later on the day before his arrest and had not seen Mr. Harris or the Defendant since the incident. Ms. Oden agreed that she initially lied to the police because she did not want her name associated with these events.

On cross-examination Ms. Oden agreed that she had been charged with aggravated robbery and two counts of carjacking related to this case. She denied that she had been promised any outcome for resolution of her cases. She also agreed that she was serving a probation sentence for two theft convictions at the time of these incidents. Ms. Oden stated that she did not mention the Defendant or Mr. Harris by name during her police interview because she did not know their names.

Dejon Gullatt testified that he met the Defendant through Mr. Gullatt's family's masonry business. The Defendant asked Mr. Gullatt to help him surprise his wife by allowing a package containing shoes to be delivered to Mr. Gullatt. Mr. Gullatt told the Defendant he was going to Toledo, Ohio and would not be home to receive the package. When the Defendant asked if Mr. Gullatt knew of an alternate address he could ship the shoes to, Mr. Gullatt arranged for the shoes to be shipped to the address of his cousin's friend, Denzel Robertson, in Rolling Meadows. Mr. Gullatt then traveled to Ohio to spend time with his family.

Mr. Gullatt testified about a flurry of phone calls that occurred on the day the package was to arrive. Initially, the Defendant called Mr. Gullatt to confirm that Mr. Robertson would be home at the time of the arrival of the box. Mr. Gullatt assured the Defendant that Mr. Robertson had agreed to be home to receive the package. Later, Mr. Gullatt called Mr. Robertson, and Mr. Robertson did not answer his phone. The Defendant again called Mr. Gullatt, this time asking if the Defendant could go to the address himself to check on the box, and Mr. Gullatt told him that would be okay. After going to the address, the Defendant called Mr. Gullatt and told him that Mr. Robertson was not at the residence but that "workers" were there. The Defendant had asked the workers about the box but was unable to locate it. Mr. Gullatt then called Mr. Robertson and learned that Mr. Robertson was in Cookeville with his cousin.

Mr. Gullatt again spoke on the phone with the Defendant who was "[p]anicking." Mr. Gullatt testified that, at the time, he did not find these events unusual. He said that he felt like he was helping the Defendant and "doing a good deed." Once the Defendant

realized the box was gone, he told Mr. Gullatt the truth, that the box contained "cocaine, heroin, meth, pills and a gun." Upon learning this, Mr. Gullatt became angry because he felt "used for the wrong reasons." As a result, Mr. Gullatt stopped answering the Defendant's phone calls. After several unsuccessful attempts to call Mr. Gullatt, the Defendant sent a text stating, "answer the phone, what are you doing, if you don't answer, the cartel will come to your uncle['s] house." The Defendant called Mr. Gullatt about ten times before Mr. Gullatt answered the call. The Defendant asked when Mr. Gullatt would return to Franklin, Tennessee from Toledo, Ohio. Out of concern for the safety of his family, Mr. Gullatt drove back to Tennessee.

Upon his return to Tennessee, the Defendant instructed Mr. Gullatt to meet him at the Defendant's house. Mr. Gullatt arranged for his cousin to take him to the Defendant's residence and leave him there. Mr. Gullatt agreed to meet with the Defendant in an attempt to show the Defendant that he had no role in the interception of the box. During their meeting, the Defendant told Mr. Gullatt that the victim and Mr. Marsh had the box and that Mr. Gullatt would have "to get [his] hands dirty." About this time, Mr. Harris arrived, and he reiterated what the Defendant had said about dirty hands. Mr. Gullatt interpreted this phrase as meaning that he would have to help the Defendant retrieve the box.

The Defendant told Mr. Gullatt that the victim and Mr. Marsh were going to be at the bowling alley in Franklin. Mr. Gullatt believed that the Defendant and Mr. Harris held him responsible for the missing box, causing him to be fearful for his safety and his family's safety. The three men drove in a silver Envoy to Ms. Oden's residence, where she joined Mr. Gullatt in the back seat of the Envoy. The Defendant instructed Ms. Oden to call the police to report a man waving a gun outside the bowling alley with children present. Ms. Oden made the false report while inside the Defendant's Envoy, and then the Defendant drove to the bowling alley where the police had already surrounded the victim's car. The Defendant stated that, if the police did not arrest Mr. Marsh, Mr. Gullatt would have to shoot him. When asked whether it would surprise him if Ms. Oden testified that she called the police from her apartment, Mr. Gullatt replied that if Ms. Oden testified differently about the false report to the police, it was likely because she had forgotten due to the length of time between the incident and trial.

Mr. Gullatt testified that, as they watched the police search the victim's vehicle, Ms. Oden stated "we ain't got nothing to do with this." From the driver's seat, the Defendant responded by brandishing a gun and alternately pointing it at Ms. Oden and Mr. Gullatt while threatening them. The Defendant said that if Ms. Oden and Mr. Gullatt did not participate, they would be "flat-lined." Eventually, they observed the police arresting Mr. Marsh and placing him in a police car for transport. Mr. Gullatt said that the police "made" the victim call her sister for transportation, and he watched as Ms.

Dodson left the bowling alley with her sister. The Defendant followed the victim back to her mother's house and parked down the street. They waited inside the Envoy until the victim returned to her car and drove away. The Defendant followed the victim to the Williamson County Jail. Mr. Harris handed Mr. Gullatt a gun, and the Defendant instructed Mr. Gullatt to get in the car with the victim and "make her pull up."

Mr. Gullatt recalled the Defendant parked next to the victim, ordering Mr. Gullatt to proceed with the plan, but Mr. Harris intervened determining there were too many police present. The Defendant drove away from the police station and returned to the victim's home. The Defendant parked nearby until a man approached and told them to leave. The Defendant then drove to a church and parked. As they waited, the victim called Ms. Oden and asked for help obtaining bond for Mr. Marsh. Ms. Oden placed the call on speaker, so everyone in the car could hear the exchange. During the phone call, Ms. Oden told the victim that she was at the Cherokee Place residence. The Defendant drove to Cherokee Place, parked down the street from the Cherokee Place residence, and instructed Ms. Oden to go inside her residence.

The three men walked to an area near the Cherokee Place residence but not directly in front of it. At this point Mr. Harris had the gun because he had taken it back from Mr. Gullatt. The Defendant told Mr. Gullatt to get in the car with the victim and demand the box. If she did not have the box, then Mr. Gullatt was to "take her out to the woods" and kill her. The victim drove up to the Cherokee Place residence as Mr. Harris handed the gun to Mr. Gullatt.

Mr. Gullatt testified that he approached the victim's Altima. The victim recognized Mr. Gullatt, so she leaned across the front seat and unlocked the passenger side door for him. While holding the gun, Mr. Gullatt entered the car and asked for the location of the box. The victim responded that she did not know what he was talking about so Mr. Gullatt "told her to pull up." Mr. Gullatt stated that he never raised the gun at the victim, he only held it in his lap.

Mr. Gullatt testified that, when he entered the Altima, the Defendant and Mr. Harris were standing approximately fifteen feet from the rear of the vehicle. Mr. Gullatt explained that, despite the Defendant's instruction to kill the victim, he planned to release the victim if he could convince her to drive away. He recalled that the victim began to "inch" out of the parking space when the Defendant opened the driver's side door, pulled the victim out of the car, "hits her with the door of the car" and then punched her. Mr. Gullatt maintained that he never hit the victim with the gun or made any aggressive movements with the gun. After the Defendant punched her, the victim stumbled, and then fled into the Cherokee Place residence. The Defendant told Mr. Gullatt to leave in

- 13 -

the victim's car. Mr. Gullatt drove the car to a nearby street, Chickasaw, and left it with the keys inside but took the victim's wallet and a phone to appease the Defendant.

Mr. Gullatt admitted that his involvement was wrong, but he explained that he allowed the attack and carjacking to happen because he was in fear for his safety and the safety of those close to him. As Mr. Gullatt walked away from the Altima, Mr. Harris called his cell phone and asked Mr. Gullatt's location. Mr. Gullatt told Mr. Harris he was on Chickasaw and, shortly thereafter, Mr. Harris drove up in a black Hyundai. Mr. Harris held a gun out the window and demanded that Mr. Gullatt return the gun Mr. Harris had earlier given him. Mr. Gullatt returned the gun, and Mr. Harris drove away. Mr. Gullatt continued walking and, when he reached an area near Jim Warren Park, the Defendant called Mr. Gullatt's cell phone and told Mr. Gullatt to meet him at the Defendant's house.

It took Mr. Gullatt approximately fifteen minutes to walk to the Defendant's home. When he arrived, he gave the Defendant the money and phone before telling the Defendant he was "done." The Defendant responded by telling Mr. Gullatt to "stay." Mr. Gullatt remained at the Defendant's house, and the Defendant told him that the Defendant would purchase Mr. Gullatt a bus ticket to Toledo, Ohio. Mr. Gullatt was to leave on the bus and not return to Tennessee. The following day, the Defendant gave Mr. Gullatt half of the stolen money, $250, to purchase a bus ticket to Toledo, Ohio. Mr. Gullatt called his cousin, who drove him to the Nashville bus station. Mr. Gullatt explained that he did not call the police after he left the Defendant's house because he was scared. After discussing it with his family, he turned himself in at a police station in Ohio.

Mr. Gullatt admitted that he was not truthful with Detective Dilworth when he first met with him because he did not think it was wise to make a statement without an attorney. Later, however, he asked to speak with Detective Dilworth. While at the Williamson County Jail, Mr. Gullatt was in the same pod with the Defendant, who inquired about what Mr. Gullatt had told the police. Mr. Gullatt assured the Defendant he had not disclosed anything to the police. Mr. Gullatt pretended to agree with the Defendant to keep him happy, but he asked one of the jail employees to arrange a meeting with Detective Dilworth.

On cross-examination, Mr. Gullatt testified that he went to the Defendant's home at around 2:00 a.m. following the incident. Mr. Gullatt said he woke up at 9:30 or 10:00 a.m. later that morning. The Defendant gave Mr. Gullatt half of the stolen money at around 10:00 a.m., and Mr. Gullatt purchased his bus ticket in Nashville at around 11:30 a.m. or 12:00 p.m. Defense counsel provided Mr. Gullatt with the bus ticket that indicated that the ticket was purchased at 4:21 a.m. and departed Nashville at 10:40 a.m.

Mr. Gullatt maintained that he spent the night at the Defendant's residence and suggested that the bus ticket was incorrect.

Mr. Gullatt confirmed that the victim, Ms. Oden, and Mr. Marsh went to the Rolling Meadows residence to get the box. He explained that, during one of the Defendant's phone calls, he told Mr. Gullatt that he was tired of waiting for the box and asked if Mr. Gullatt could arrange for Ms. Oden to retrieve the box. Mr. Gullatt called Ms. Oden and asked her to retrieve the box for the Defendant. Mr. Gullatt denied that Ms. Oden ever possessed the box because, when she went to the Rolling Meadows residence, she was unable to find it. He admitted that he did later learn about the box "going to Nashville." Mr. Gullatt maintained his innocence as to his role in these offenses. He said that the gun was not his gun, and he was not a willing participant in these events.

Sherrita Russ was on the front porch of a residence near the Cherokee Place residence at 2:00 a.m. on July 27, 2017. When Ms. Russ stepped out onto the porch, she saw a parked Altima with two men standing on either side of the car and a third man, Barry Harris, standing a distance away. According to Ms. Russ, Mr. Harris never approached the Altima, but she heard him yell, "What the 'H' are y'all doing" before he turned and walked away. Ms. Russ did not disclose what she witnessed to police officers that night because she avoided the police by reentering the residence. Ms. Russ later spoke with the police and identified the Defendant as one of the two men flanking the Altima. She also saw "a skinny dude" who hit the victim.

Leon Rice also witnessed the carjacking during the early morning hours of July 27, 2017. He saw a man pull the victim out of her car and drive away in it. He agreed that he saw a "skinny dude" speak to two guys "between the buildings."

After hearing this evidence, the jury convicted the Defendant of misdemeanor joyriding in Count 1, (as a lesser included offense of the charged offense of carjacking by use of a deadly weapon), guilty of the charged offense of carjacking by force or intimidation in Count 2, and guilty as charged of aggravated robbery by use of a deadly weapon in Count 3. After the jury was discharged, the Defendant made an oral motion for a "judgment N.O.V." as to Count 3. The Defendant argued that the verdict in Count 1 convicting him of joyriding was "inconsistent" with the finding that he accomplished the aggravated robbery with a deadly weapon in Count 3. The trial court agreed and granted the motion.

The Defendant then filed a motion for a "judgment not withstanding the verdict, to alter or amend and to void the jury's conviction on Count II for carjacking." The State responded that Count 1, joyriding, should be merged with Count 2, carjacking.

## B. Sentencing

At the sentencing hearing, the trial court sought clarification about the Defendant's motion. The Defendant summarized the trial court's decision to grant his oral motion for "judgment notwithstanding the verdict" "on grounds that that was an inconsistent or improper verdict because [the Defendant] . . . could not be found guilty of armed robbery" when he had been acquitted of carjacking with a weapon. The Defendant contended that the convictions for joyriding in Count 1 and carjacking in Count 2 were also "inconsistent" and "improper." He argued that the jury could not find him guilty on both carjacking and also on the lesser-included offense of joyriding. The Defendant asked the trial court to dismiss the carjacking conviction and sentence the Defendant on the remaining conviction for joyriding.

The State responded that the two counts for carjacking were alternative charges and thus, Count 1, joyriding, should be merged into Count 2, carjacking. Further, the State argued that inconsistent verdicts are allowed in Tennessee and that the trial court should recognize the sanctity of the jury's deliberation. The trial court stated that it would take the matter under advisement.

The State submitted the presentence report as an exhibit to the sentencing hearing for the trial court's consideration. The State also submitted copies of the Defendant's prior convictions. The Defendant's wife testified about her disabilities and the Defendant's existing medical conditions. Detective Dilworth also testified about gang behavior related to tattoos and indicia of gang affiliation.

In a subsequent written order, the trial court acknowledged the Defendant's motion for a "judgment not withstanding the verdict, to alter or amend and to void the jury's conviction on Count II for carjacking." It then stated: "The Court deems this Motion as a Motion For Judgment of Acquittal." The trial court then made the following findings as to the Defendant's motion:

> [T]he jury found Defendant not guilty on Count I of the offense of Carjacking by use of a deadly weapon but guilty of Count II, Carjacking by use of force or intimidation. The jury then found Defendant guilty of Count III, Aggravated Robbery accomplished with a deadly weapon. There was no proof at trial that Defendant used a deadly weapon during this criminal episode. Instead, the victim testified that Gullatt got into the passenger side of the victim's vehicle and put a gun in her face. Gullatt testified that he held the gun in his lap. Either way, both the victim and Gullatt testified that Gullatt, not Dwayne Harris, had the gun. The victim further testified

that Defendant approached the driver's side of her vehicle, pulled her out of the vehicle, and beat her. Again, there was no proof at trial that Defendant had or used a weapon. Accordingly, as thirteenth juror, the Court finds Defendant not guilty of Aggravated Robbery accomplished with a deadly weapon, but guilty of robbery. The Court hereby amends its decision on the last night of trial to dismiss or grant a judgment of acquittal on Count III. The Court is able to amend this decision because a Judgment form has not yet been entered on this charge.

Regarding Count II, carjacking by use of force or intimidation, the Court denies Defendant's Motion For Judgment Not -Withstanding The Verdict, To Alter Or Amend And To Void The Jury's Conviction On Count II For Carjacking. "The Double Jeopardy Clauses of both the United States and Tennessee Constitutions state no person shall be put in jeopardy of life or limb for the same offense." *State v. Addison*, 973 S.W.3d 260 (Tenn. Crim. App.) (citing U.S. Const. amend 5; Tenn. Const. art. I, § 10). The Due Process Clauses protect against a second prosecution for the same offense after acquittal or conviction. *State v. Addison*, 973 S.W.3d at 267. It also protects against multiple punishments for the same offense. *Id*.

"Typically, when the defendant is convicted of multiple offenses which would violate double jeopardy, the trial judge will merge the lesser offense into the greater offense." *State v. Cribbs*, 1997 WL 61507 (Tenn. Crim. App. 1997) (*citing State v. Banes*, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993)). The principle of merger is applicable when there are alternative charges: "the guilty verdict on the greater charge stands and the guilty verdict on the lesser charge merges into the greater charge." *Banes*, 874 S.W.2d at 81.

In the instant case, Counts I and II were alternative charges. In Count I, the jury found Defendant guilty of the lesser included offense of joyriding. Accordingly, the Court will merge Count I, joyriding, into the greater charge of Carjacking in Count II. The Court will sentence Defendant on Count II, Carjacking, which is a Class B Felony.

As for Count III, the Court has already, as thirteenth juror, reduced the charge from Aggravated Robbery to Robbery. As stated above, there was no proof at trial that Defendant used a deadly weapon to accomplish the robbery. Defendant argues that Count III should be dismissed because it, like carjacking, requires a taking of property. While Defendant is correct

that both charges require a taking of property, the Court finds that the proper remedy is to merge Count III with Count II.

The trial court then considered the principles and purposes of the sentencing act, the facts of this case, and the arguments of both parties before sentencing the Defendant to eleven months and twenty-nine days for Count 1, thirty years for Count 2, and fifteen years for Count 3. The trial court then merged both Count 1 and Count 3 into Count 2 for a total effective sentence of thirty years. It is from this judgment that the Defendant and the State now appeal.

## II. Analysis

In this consolidated appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions: (2) the trial court improperly admitted testimony about "the box" which was highly prejudicial to the Defendant; (3) the trial court improperly admitted inadmissible hearsay; and (4) Detective Dilworth's testimony about Mr. Harris's, a non-testifying co-defendant, statement incriminating the Defendant violated his constitutional right to confrontation. The State appeals from the trial court's judgment reducing the jury's conviction for aggravated robbery in Count 3 to robbery and the trial court's judgment merging Count 3 into Count 2. We first address the Defendant's issues raised on appeal and then the State's issues.

### A. Sufficiency of the Evidence

The Defendant asserts that there is insufficient evidence to support his convictions for carjacking and aggravated robbery. He argues that the State presented no proof that he personally took the victim's car and other property, and that the accomplice testimony was uncorroborated.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be

drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant was charged with alternate counts of carjacking. Carjacking is "the intentional or knowing taking of a motor vehicle from the possession of another" either by use of "[a] deadly weapon" or by "[f]orce or intimidation." T.C.A. § 39-13-

404(a) (2018). The Defendant was convicted of carjacking by force or intimidation (Count 2), but convicted of the lesser-included offense of joyriding in Count 1, which charged carjacking by use of a deadly weapon. Joyriding is statutorily defined in Tennessee Code Annotated section 39-14-106, which provides "[a] person commits a Class A misdemeanor who takes another's automobile, airplane, motorcycle, bicycle, boat or other vehicle without the consent of the owner and the person does not have the intent to deprive the owner thereof."

A conviction for aggravated robbery, as relevant to this case, requires proof beyond a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and that the robbery was "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401(a), -402(a)(1) (2018).

At trial, the State proceeded under a theory of criminal responsibility to prove the Defendant's guilt of the offenses. The jury was instructed on the theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a) (2018). Tennessee Code Annotated section 39-11-402(2) provides that a person is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" The person must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" S*tate v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant's requisite criminal intent may be inferred from his "presence, companionship, and conduct before and after the offense." *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." *Id*. at 171. Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. *Id*.

The evidence, viewed in the light most favorable to the State, showed that the Defendant arranged, through Mr. Gullatt, to receive a box containing drugs and a gun.

When the box went missing, the Defendant held Mr. Gullatt responsible based upon Mr. Gullatt's arranging for a mailing address and for Ms. Oden to retrieve the box. The Defendant demanded that Mr. Gullatt return from Toledo, Ohio to help recover the contents of the box. He arranged a meeting with Mr. Gullatt, and a plan was devised for Ms. Oden to make a false report to the police in an effort to isolate the victim from Mr. Marsh. Once Mr. Marsh was held in custody, Ms. Oden lured the victim to the Cherokee Place residence with the promise that Ms. Oden would help secure bond for Mr. Marsh. The men waited outside the Cherokee Place residence for the victim. When she parked her car in front of the Cherokee Place residence, Mr. Gullatt, at the Defendant's instruction, entered the victim's Altima and demanded to know the location of the box. The Defendant then pulled the victim out of the car by her hair and punched her in the face. After the victim fled, the Defendant instructed Mr. Gullatt to take the victim's car. The next morning, the Defendant gave Mr. Gullatt half of the money stolen from the victim's car and told him to use the money to purchase a bus ticket to leave Tennessee.

We conclude that this is sufficient evidence upon which a rational jury could conclude beyond a reasonable doubt that the Defendant was associated with the venture, acted with knowledge that Mr. Gullatt was going to hold the victim at gunpoint, engaged in the assault on the victim, and shared in the criminal intent to take the victim's car and property by force.

As to the Defendant's contention that there is insufficient evidence to convict him because he did not physically take the victim's items and car, we reiterate that the State proceeded under the theory of criminal responsibility. The defendant need not take a physical part in the crime in order to be held criminally responsible. *Lemacks*, 996 S.W.2d at 170. The evidence at trial was that Mr. Gullatt drove away in the Altima and parked it one street over before taking cash and phones from the victim's car. In addition, there was an abundance of evidence that the Defendant both promoted and assisted in the attack on the victim and then directed Mr. Gullatt to drive away in the vehicle. The Defendant's presence and support of the endeavor showed that he furnished substantial assistance in the commission of these felony offenses.

The Defendant also argues that there is insufficient corroboration of Mr. Gullatt and Ms. Oden's testimony as accomplices. It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). The law in Tennessee regarding accomplice testimony has been described as follows:

> The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also

that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Whether sufficient corroboration exists is a determination for the jury. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

In our view, there was sufficient evidence to corroborate the testimony of the accomplices to these crimes. Ms. Oden and Mr. Gullatt both testified as to the events leading up to these offenses with some discrepancies between their testimony. Ms. Oden and Mr. Gullatt testified that, at the Defendant's instruction, Ms. Oden made a false police report in an attempt to get Mr. Marsh arrested for outstanding warrants. The victim testified consistently with these events, and Detective Dilworth confirmed that Ms. Oden made the report to the police that caused Mr. Marsh's arrest. Furthermore, Ms. Oden identified her voice on the recording of the phone call to police dispatch and her cell phone number was identified in the police call system.

The victim testified that Mr. Gullatt entered her car with a gun and the Defendant pulled her from her car and hit her. Shabree and Detective Dilworth both testified about the victim's visible injuries following her interaction with the Defendant and Mr. Gullatt. Two persons in the neighborhood also testified that the victim was pulled from her car and that her car was driven away. One of these persons identified the Defendant as one of the perpetrators. Mr. Gullatt testified that he entered the victim's car, and the Defendant pulled the victim out of the car and hit her. Mr. Gullatt testified that he drove the victim's car to a nearby street and left the car. Detective Valiamont testified that he found the Altima where Mr. Gullatt testified he had left the car.

Mr. Gullatt testified that he took money and a cell phone from the the victim's car. The victim testified that her car was returned to her but the money and cell phones were not recovered. Mr. Gullatt testified that he gave the proceeds to the Defendant, who gave him half of the money to buy a bus ticket to Toledo, Ohio. The Defendant's bus ticket to Toledo, Ohio was produced at trial.

When viewed under the standards discussed above, we conclude that there was sufficient evidence to corroborate the testimony of the accomplices and to support the jury's verdicts. The Defendant is not entitled to relief as to this issue.

### B. Motion to Exclude Evidence about "the Box"

The Defendant asserts that the trial court erred when it denied his motion to exclude evidence about the box. He contends that evidence about the box was prejudicial to him and the trial court failed to expressly find that evidence concerning the box was clear and convincing. The State responds that the trial court properly allowed admission of this evidence. We agree with the State.

Relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." T.R.E. 402, 403. Rule of Evidence 404 prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. T.R.E. 404(b). The trial court may admit the evidence for non-character purposes if four conditions are met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

T.R.E. 404(b). If a trial court "substantially complies" with these requirements, this court will review for an abuse of discretion. *State v. McCary*, 119 S.W.3d 226, 244 (Tenn. Crim. App. 2003) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). If the evidence sought to be admitted is relevant to an issue other than the accused's character, such as identity, motive, common scheme, intent, or rebuttal of accident or mistake, it may be admitted for that purpose so long as the danger of unfair prejudice does not outweigh the probative value. T.R.E. 404(b), *Advisory Comm'n Cmts.*; *McCary*, 119 S.W.3d at 243.

- 23 -

The Defendant filed a pre-trial motion motion to exclude evidence about the box, asserting that the evidence was more prejudicial than probative pursuant to Tennessee Rules of Evidence 401 and 402. The motion also argued that "Jurors may also find that [t]his is Evidence of a crime," citing Tennessee Rule of Evidence 404. The State responded that "any testimony that drugs may have been in a box that was taken is necessary to complete the full story." The State argued that this evidence was offered to show contextual background and avoid confusion of the jury. Following a hearing, the trial court stated:

> The Court finds that the story about the box, the information surrounding the box, does tell the whole story. It shows a possible motive. It links certain individuals to the entire story and the fact that all of this occurred in temporal proximity is also very important to the State's case so the Court respectfully denies number four of the [D]efendant's motion.

In the case under submission, we conclude the State did not introduce evidence of the box and its contents to prove that the Defendant acted in conformity with a character trait involving the propensity to engage in criminal activity. The evidence was offered to show the Defendant's motive in orchestrating these events. Although this evidence may have implied that the Defendant engaged in criminal behavior, the State did not introduce it for this purpose. It was introduced to help the jury understand the evidence and the motive behind the events that followed. This relevant evidence, therefore, in our opinion does not constitute propensity evidence, so as to be precluded by Tennessee Rule of Evidence 404(b).

The Defendant also argues that the trial court did not expressly find proof of the act to be clear and convincing. With regard to Tennessee Rule of Evidence 404(b)(3), the trial court did not explicitly state the proof about the box was clear and convincing. However, it is clear from a reading of the entire record that such a finding was implicit in the ruling of the trial court admitting the disputed evidence. *See State v. Clark*, 452 S.W.3d 268, 291 (Tenn. 2014) (trial court did not "expressly state" that evidence was "clear and convincing," however, the defendant's repeated admission to conduct supported a "clear and convincing" finding); *State v. Ray Anthony Nelson*, No. 03C01-9706-CR-00197, 1998 WL 694971, at *8-9 (Tenn. Crim. App, at Knoxville, Sept. 9, 1998) (holding trial court substantially complied with Rule 404(b) even though trial court did not specifically make a finding that the proof was clear and convincing). In our view, the trial court substantially complied with the requirements of Rule 404(b). When the proffered evidence is subject to the procedural requirements of Tennessee Rule of Evidence 404(b) and when the trial court has substantially complied with those requirements, any decision as to whether to admit evidence under Rule 404(b) will be reversed only for an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn.

1997). Because the term "discretion" essentially "denotes the absence of a hard and fast rule," *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999), we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *Id.* (citing *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

Accordingly, we conclude that that the tendency of the undisputed evidence to show the Defendant's motive outweighed any unfair prejudice from the jury's possible inference that the Defendant engaged in another criminal act. Thus, the trial court properly admitted evidence about the box to show motive and aid the jury in understanding the evidence. The Defendant is not entitled to relief.

### C. Alleged Inadmissible Hearsay

The Defendant asserts that Detective Dilworth gave non-responsive answers containing hearsay during cross-examination, violating the Defendant's confrontation rights. The State responds that the Defendant has waived our review for failure to contemporaneously object to the testimony. Additionally, the State asserts that only two of the four alleged improper responses were raised in the Defendant's motion for new trial.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id.* at 802. The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Tennessee Constitution provides the corresponding right "to meet witnesses face to face." Tenn. Const. art. I, § 9.

When a defendant fails to object on the basis of inadmissible hearsay, "the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" *State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000) (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)); s*ee, e.g., State v. Burton*, 751 S.W.2d 440, 448 (Tenn. Crim. App. 1988) (failure to make contemporaneous objection to evidence resulted in waiver of issue); *State v. Davis*, 741 S.W.2d 120, 124 (Tenn. Crim. App. 1987) (failure to object to evidence "until after it was all placed before the jury" resulted in waiver of issue); *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who

failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Based upon our review of the record, we discern no error was committed, and any consideration of whether the statements submitted at trial could have been inadmissible hearsay is waived for failure to object to the testimony at trial. *See* T.R.A.P. 36(a). In addition, we note that the issue presented by the Defendant fails to meet the requirements necessary for a finding of plain error. The Defendant is not entitled to relief as to this issue.

### D. *Bruton* Violation

The Defendant asserts that the trial court should have granted a mistrial when Detective Dilworth testified about Mr. Harris's identification of the Defendant because Mr. Harris's identification violated his constitutional right to confrontation.

The admission of a non-testifying co-defendant's statement incriminating the complaining defendant violates the complaining defendant's constitutional right of confrontation. *Bruton v. United States*, 391 U.S. 123, 126 (1968); *see* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *Smart v. State*, 544 S.W.2d 109, 111-12 (Tenn. Crim. App. 1976). The *Bruton* rule should only be applied when the non-testifying co-defendant's statement constitutes 'a significant portion of the evidence of guilt,' and . . . if 'ample evidence was available to demonstrate [the defendant's] guilt without reliance upon his co-defendant's confession,' the violation would be considered harmless error." *State v. Ogle*, 666 S.W.2d 58, 60 (Tenn. 1984). If "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison[,]" then the improper use of the admission is harmless beyond a reasonable doubt. *Schneble v. Florida*, 405 U.S. 427, 430 (1972). The mere finding of a violation of the *Bruton* rule . . . does not automatically require reversal of the ensuing criminal conviction." *Id.* Reversal is not required unless it is proven beyond a reasonable doubt that the error complained of contributed to the verdict. *Chapman v. California*, 386 U.S. 18, 24 (1967); *see State v. Lonta Montrell Burress, Jr., and Darius Jerel Gustus,* No. E2013-01697-CCA-R3-CD, 2014 WL 6855226, at *16 (Tenn. Crim. App., at Knoxville, Dec. 4, 2014*), no Tenn. R. App. P. 11 application filed*.

The Defendant filed a pre-trial motion to exclude statements of non-testifying co-defendants and the trial court granted the motion. At trial, defense counsel questioned Detective Dilworth about identification of the Defendant as follows:

Defense:      Nobody – at that time you investigated, that day of the crime, you didn't locate anybody who identified [the Defendant] that date.  Is that correct?

Detective:    . . . No, sir, that's not correct because what I believe, I believe I obtained . . . a warrant before I went home that day for [the Defendant], which would have meant I had probable cause. . . . So he would have been identified that day.

Defense:      Okay.   And part of that identification came from [the victim]'s sister?

Detective:    No, sir, that was later.   The identification came from Mr. Barry Harris, who stated he was extremely familiar with [the Defendant] and personally witnessed the incident.

Defense Counsel objected, and the trial court sustained the objection.  Defense counsel resumed cross-examination with no mention of a curative instruction or a mistrial.

At the close of the State's proof, defense counsel raised the issue while arguing his motion for a judgment of acquittal.  Defense Counsel stated, "I should have asked for the Court, to at that point, charge the jury to disregard that but I think it calls more attention to it than not."   After some further discussion, the trial court denied the motion for a judgment of acquittal, conducted *Momon* hearings, and discussed the proposed jury instructions with the parties.  As they were preparing to bring the jury in the courtroom, the following exchange occurred:

Defense:      Judge, one other issue that we covered a little bit, but, Judge, are you going to admonish the jury or advise the jury not to regard the statement of Detective Dilworth regarding admission, what their - -

Court:        I can put that in the instructions but you have to be careful or you're drawing more attention to it.

Defense:      That's true.

Court:        I'll let you think about that.

Defense:      We can reconsider that, Judge.

- 27 -

| Court: | We can do a - - you know, we can add on to that packet we just handed you. |
|---|---|
| Defense: | Sure. |
| Court: | And you just need to think about what you want to do. |
| Defense: | I will.  Thank you. |
| Court: | Certainly, I would tell the State you cannot mention that in your closing argument. |
| Defense: | Okay.  Thank you. |
| State: | Sure. |

Defense counsel did not raise the issue again.

In our view, these interactions indicate that defense counsel did not seek a curative instruction for tactical reasons, thus precluding plain error relief on appeal.  *See State v. Ogle*, 666 S.W.2d 58, 60 (Tenn. 1984).  Furthermore, there was ample evidence identifying the Defendant's involvement in these crimes absent Detective Dilworth's mention of Mr. Harris's identification of the Defendant.  The victim identified the Defendant in a photograph and testified at trial with certainty about the identification.  She stated that she was parked under a street light which provided ample light for her to observe her attackers.  One witness to the carjacking and robbery identified the Defendant as a participant, in addition to two of the Defendant's co-defendants, Ms. Oden and Mr. Gullatt's testimony regarding the Defendant's involvement.  In light of the evidence at trial, we cannot conclude that Detective Dilworth's testimony constituted "a significant portion of the evidence of guilt."  The Defendant is not entitled to relief as to this issue.

### E. State's Issues

In a cross appeal, the State challenges the trial court's modification of Defendant's aggravated robbery conviction to robbery and the merger of the robbery conviction into the carjacking conviction.  The State asserts that the evidence supports the jury's finding of guilt of aggravated robbery under a theory of criminal responsibility; therefore, the trial court's decision to overturn the jury's verdict was not supported by the evidence.

Preliminarily, we address the trial court's wording in the order referring to its decision "as thirteenth juror." This reference to acting as "thirteenth juror" conflicts with the trial court's explicit statement that it "deem[ed]" the pleading a motion for a judgment of acquittal and then finding the Defendant not guilty of the charged offense. Based upon our review of the record, we agree with the State that the trial court was proceeding under Tennessee Rule of Criminal Procedure 29, and not under the "thirteenth juror" rule. Therefore, we review this issue accordingly.

Rule 29(a) of the Tennessee Rules of Criminal Procedure provides that a "court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Further, Rule 29(c) reads as follows:

> If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 30 days of the date the order of sentence is entered or within such further time as the court may fix during the 30-day period. . . . If a verdict of guilty is returned the court may on such motion, set aside the verdict and after disposing of a motion for a new trial enter judgment of acquittal. The [S]tate shall have the right of appeal where the court sets aside a verdict of guilty and enters a judgment of acquittal.

Tenn. R. Crim. P. 29(c). The standard by which the trial court determines a motion for judgment of acquittal is, essentially, the same standard applied by this Court in "determining the sufficiency of the evidence after a conviction; that is, whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Gillon*, 15 S.W.3d 492, 496 (Tenn. Crim. App. 1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard the trial court must take the strongest legitimate view of the evidence in favor of the State, and allow it all reasonable inferences which might be drawn therefrom. *See id*.

A motion for judgment of acquittal presents a question of law. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995); *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The trial court must only determine if the evidence is legally sufficient to sustain a conviction. *Adams*, 916 S.W.2d at 473. "The trial court is not permitted to weigh the evidence in reaching its determination." *Id*. "An appellate court must apply the same standard as a trial court when resolving issues predicated upon the grant or denial of a motion for judgment of acquittal." *Id*. at 473. As the issue presents a question of law, our review is *de novo*. *Id*.

Because we have already determined that there is sufficient evidence to support the Defendant's convictions, we vacate the trial court's grant of the motion for judgment of acquittal. We note that the trial court, in granting the motion, appeared to rely on a concern that the jury had rendered inconsistent verdicts as to Count 1 and Count 3. In Tennessee, inconsistent verdicts are unassailable absent a legal insufficiency. *State v. Davis*, 466 S.W.3d 49, 73 (Tenn. 2015) (concluding that this rule applied when the jury, in one count, convicted the defendant of second degree murder, thereby establishing that he committed a knowing killing and then, on the second count, the jury acquitted the defendant of second degree murder, choosing instead to convict the defendant of reckless homicide). The Tennessee Supreme Court stated, "We continue to agree with the significant majority of jurisdictions that inconsistent jury verdicts are not a basis for relief." *Id.* The verdicts are still subject, however, to analysis of whether the evidence is sufficient to sustain them. *Id.* at 72; *see also State v. Ike O. Nwangwa*, No. E2015-01086-CCA-R3-CD, 2016 WL 1615670, at *3 (Tenn. Crim. App., at Knoxville, Apr. 20, 2016), *no Tenn. R. App. P. 11 application filed*.

Accordingly, as to Count 3, we vacate the trial court's order granting the motion for judgment of acquittal of the offense of aggravated robbery and reinstate the jury's verdict finding the Defendant guilty of aggravated robbery. The trial court also improperly merged Count 3 into the carjacking offense. Merger is required for guilty verdicts on alternative charges to avoid imposing multiple punishments for the same offense. *See State v. Price*, 46 S.W.3d 785, 824 (Tenn. Crim. App. 2000). Count 3, aggravated robbery, is not an alternative count to carjacking. *See State v. Wilson*, 211 S.W.3d 714 (2007).

Upon remand, the trial court shall reinstate the jury's verdict of aggravated robbery in Count 3, sentence the Defendant for aggravated robbery in Count 3, and determine the issue of the alignment of that sentence with the sentence in Count 2. The trial court shall correct the judgment in Count 2 to omit the language indicating the merger of Count 3 into Count 2. Count 1 and Count 2 have been correctly merged by the trial court.

## III. Conclusion

After a thorough review of the record and the applicable law, we affirm in part, vacate in part and remand to the trial court for the correction of the judgment in Count 2 and the entry of judgment for aggravated robbery in Count 3.

_____
ROBERT W. WEDEMEYER, JUDGE